TOWER AUTOMOTIVE, Appellant, v. ILLINOIS WORKERS' COMPENSATION COMMISSION *et al.* (Robert Nawrot, Appellee).

First District (Illinois Workers' Compensation Commission Division)
No. 1—09—3161WC

Opinion filed January 31, 2011.—Rehearing denied March 2, 2011.

Rusin Maciorowski & Friedman, Ltd., of Chicago (Daniel R. Egan, of counsel), for appellant.

Corti, Aleksy & Castaneda, of Chicago (Richard Aleksy and Megan Kivisto, of counsel), for appellee.

JUSTICE HOFFMAN delivered the judgment of the court, with opinion.

Presiding Justice McCullough and Justices Hudson and Holdridge concurred in the judgment and opinion.

Justice Stewart concurred in part and dissented in part, with opinion.

## OPINION

Tower Automotive (Tower) appeals from an order of the circuit court of Cook County which confirmed a decision of the Illinois Workers' Compensation Commission (Commission), awarding Robert Nawrot (the claimant) certain compensation pursuant to the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2004)), for injuries he allegedly received while in Tower's employ on June 30, 2005. Tower contends that the Commission's findings, that the claimant suffered an accident arising out of and in the course of his employment and that his current condition of ill-being is causally related to an accident while working, are against the manifest weight of the evidence. It argues, therefore, that the Commission's awards of benefits to the claimant for temporary total disability (TTD) and permanent partial disability (PPD) are also against the manifest weight of the evidence. In addition to claiming that the Commission's calculation of the claimant's average weekly wage and its award of $165,289.16 to the claimant for reasonable and necessary medical expenses are against the manifest weight of the evidence, Tower claims that both the wage calculation and medical expense award are contrary to law. For the reasons that follow, we reverse that portion of the circuit court's judgment that confirmed the Commission's $165,289.16 award for medical expenses, affirm the circuit court's judgment in all other respects, vacate the Commission's award to the claimant for

medical expenses, and remand this matter to the Commission with instructions to award the claimant medical expenses in an amount consistent with the holdings expressed herein.

The following facts necessary to a resolution of this appeal are taken from the evidence presented by the parties and admitted during the arbitration hearing which was held pursuant to the Act to resolve the claimant's application for adjustment of claim.

The claimant began working for Tower as a material handler in November of 2004. The duties of that position consisted of operating a forklift, loading and unloading trucks, and delivering parts throughout Tower's facility. The claimant testified that he drove the forklift 60% of the time, requiring that he "constantly" move his head from side to side to avoid foot traffic. In May of 2005, according to the claimant, he began to experience tingling in his hands which radiated up his arms to his elbows. The claimant stated that he reported the problem to his immediate supervisor, Said Ali, and that he was told to advise Ali if the condition worsened.

On instructions from Ali, the claimant sought treatment at the Ingalls Occupational Health Center (Ingalls), Tower's company clinic, on June 30, 2005. He gave a history of operating a forklift 8 to 12 hours per day and complained of bilateral hand numbness and weakness. The claimant was diagnosed with tendinitis, given medication, instructed to return for follow-up treatment on July 5, 2005, and released to return to full-duty work, without restrictions.

The claimant returned to Ingalls on July 5, 2005. In addition to hand and wrist pain, he reported having experienced spasms in his trapezius bilaterally and numbness starting at the forearm and encompassing the entire hand. The claimant was advised to wear wrist splints at night, and his medication was adjusted. Again, however, his work duties were not restricted.

When the claimant returned to Ingalls the following week and reported no improvement, an EMG was ordered. He underwent the EMG on July 22, 2005. The study revealed evidence of mild bilateral carpal tunnel syndrome at the wrists. There was also evidence of mild-to-moderate right cervical radiculopathy, active in the C6-C7 myotomes, and evidence of more chronic old degenerative disease in the upper left extremity. When the claimant returned to Ingalls to review the results of the EMG, a cervical MRI was suggested, and he was referred for an orthopaedic evaluation.

On August 15, 2005, the claimant returned to Ingalls, complaining of constant numbness in his hands to an extent that he was unable to feel anything. The claimant was diagnosed with cervical radiculopathy and his work duties were restricted to no overhead work with either

arm, and no climbing of ladders, stairs, or inclines. Three days later, the claimant returned to Ingalls and reported that his symptoms were getting worse. His work restrictions were increased to include limitations on driving. An MRI was ordered, and the claimant was referred to Dr. Martin Luken at the Chicago Institute of Neurosurgery and Neuroresearch.

When the claimant saw Dr. Luken on August 22, 2005, he reported that, two or three months earlier, he began to experience "troublesome numbness" in the palms of his hands, thumbs, and index fingers, right greater than left, which occasionally radiated into his forearms. Although the claimant was unable to attribute his symptoms to any specific injury or activity, he did report that he worked 12 hours per day and performed duties which required him to twist his neck as he operated a forklift. He stated that his symptoms worsened as the workday progressed. Dr. Luken concluded that, while the claimant's symptoms and clinical findings were compatible with a combination of cervical radiculopathy and carpal tunnel syndrome, his clinical examination of the claimant also suggested the possibility of cervical compression myelopathy. Dr. Luken suggested that the claimant undergo a cervical MRI.

The claimant returned to Dr. Luken for follow-up treatments in August and September 2005, and continued to report numbness and tingling in his upper extremities along with a burning sensation across his shoulder blades. Dr. Luken continued the claimant's work restrictions.

On September 20, 2005, the claimant was examined by Dr. Richard Lim. At that time, the claimant complained of numbness in both hands and neck pain which began in June 2005. After examining the claimant and reviewing the claimant's EMG and the X-rays of his cervical spine, Dr. Lim diagnosed bilateral carpal tunnel syndrome, cervical spondylolisthesis, and cervical spondylitis myelopathy, and he opined that the carpal tunnel syndrome was work related, whereas the claimant's cervical condition was "most likely *** a degenerative condition and pre-existing his current level of symptoms." Dr. Lim did not believe that the claimant had reached maximum medical improvement (MMI). He too recommended that the claimant undergo a cervical MRI and, because of the severe numbness and clumsiness in his hands, Dr. Lim had reservations about the claimant operating a vehicle and restricted the use of his upper extremities for any type of repetitive motion.

On October 17, 2005, the claimant sought treatment from his family physician, Dr. Eleazer Calero. Dr. Calero diagnosed bilateral carpal tunnel syndrome and cervical radiculopathy and prescribed a cervical MRI.

The claimant underwent a cervical MRI which revealed marked facet degenerative change at C4-C5 with anterolisthesis and severe spinal stenosis; degenerative disc disease at C5-C6 and C6-C7 with disc osteophyte complex causing mild stenosis, lateral recess, and neural foraminal narrowing; and a small central disc protrusion at C3-C4. After reviewing the results of the MRI, Dr. Calero referred the claimant to Dr. Keith Schaible, a neurosurgeon, for evaluation.

At the request of Tower, the claimant was examined by Dr. William Baylis on November 1, 2005. The claimant reported a history of numbness, tingling and weakness in both hands, since June 2005. Dr. Baylis's notes state that the claimant was a forklift driver for "quite a long time." Following his examination of the claimant, Dr. Baylis diagnosed cervical spondylosis with myelopathy and bilateral carpal tunnel syndrome, right greater than left. He noted that the claimant had no history of an "obvious injury" to his upper extremities or his neck, and opined that the claimant's carpal tunnel syndrome "is definitely work related, but the cervical spondylosis is not." According to Dr. Baylis, the claimant's cervical spondylosis is the result of a degenerative process.

On November 9, 2005, the claimant was examined by Dr. Schaible. At that time, the claimant complained of numbness in his arms and hands which progressed into his shoulder, accompanied by spasms, stiffness and pain in his neck and across his shoulders. He reported that his symptoms had begun six months earlier. Following his exam of the claimant and a review of the claimant's EMG, Dr. Schaible diagnosed a C4-C5 subluxation and "significant" stenosis which was probably degenerative in nature. He opined that the claimant's symptoms were secondary to myelopathy. Dr. Schaible recommended that the claimant undergo a surgical decompression and concomitant fusion at C4-C5.

The claimant had surgery on December 2, 2005, at the Advocate Christ Medical Center. The procedure consisted of a partial anterior vertebral corpectomy of C4-C5, a C3-C4 discectomy and interbody fusion at C3 to C5, with allograft and anterior cervical spinal instruments. The postoperative diagnosis was severe cervical spinal stenosis at C4-C5, secondary to spondylosis, and a C3-C4 disc herniation. Following surgery, the claimant continued to treat with Dr. Schaible.

On January 10, 2006, the claimant had an X-ray of his cervical spine which revealed that his anterior cervical fusion had failed. As a consequence, Dr. Schaible recommended that the fusion be "revisited." Thereafter, the claimant underwent a second cervical fusion on January 13, 2006.

Following his discharge from the hospital on January 16, 2006, the claimant continued to treat with Dr. Schaible, and he underwent a course of physical therapy. Dr. Schaible's notes for the period indicate that the claimant was improving, but that he still complained of tingling in his hands.

On November 21, 2006, the claimant underwent an EMG which had been ordered by Dr. Schaible. After reviewing the results, Dr. Schaible concluded that the test failed to demonstrate evidence of carpal tunnel syndrome.

The record reflects that when the claimant saw Dr. Schaible on January 18, 2007, he inquired as to whether his work as a forklift driver contributed to his neck problems. Dr. Schaible noted that the claimant's work "involves excess neck strain in terms of his positioning, looking up, looking about, looking back to make sure he's not running into anybody, [and] the associated rapid starts and stops, [and] the bumping." He went on to state "[t]hat a patient's job or occupation can involve excess strains, neck positioning, prolonged strain, unnatural positions of the neck, associated with bumps and this and that, and certainly is associated with accelerated or increased degenerative spondylitic disease, and thus it is certainly not without reason that this type of work certainly could have aggravated his neck condition, worsened it, if you will." Dr. Schaible admitted that January 18, 2007, was the first time that he had opined that the claimant's condition might be work related or that it might have been aggravated or accelerated by his work. However, he testified that "based upon [the claimant's] job duties, the description of his neck movements, the fact that he had accelerated degenerative disc disease, accelerated so much for such a young person, that he developed symptoms of pressure on the spinal cord from these symptoms or these changes, that again in my opinion to a reasonable degree of medical certainty *** the job duties certainly contributed, perhaps accelerated his underlying degenerative disc disease."

The claimant underwent a functional capacity evaluation (FCE) on March 6, 2007. The tests revealed that the claimant could work eight-hour days as a forklift operator or material handler provided he did not lift more than 55 pounds floor to chest, more than 50 pounds from chest to shoulder, or more than 25 pounds overhead.

On April 10, 2007, Dr. Schaible released the claimant to return to work, restricting his activity to lifting no more than 25 pounds and no overhead lifting. The claimant returned to work at Tower on May 7, 2007. He testified that, upon returning to work, he performed the same duties as before his surgery.

The claimant was again examined by Dr. Lim on October 20, 2007. The claimant reported that the numbness in his left hand was gone and the majority of the numbness in his right hand was also gone. However, he complained of intermittent numbness and tingling in the fingers of both hands and chronic neck pain. Dr. Lim opined that the claimant had a preexisting condition of degenerative disc disease, spondylolisthesis, and myelopathy which he could not "directly correlate" to any industrial injury.

At the arbitration hearing held on December 13, 2007, the claimant testified that he experiences a stiff neck every morning and that his neck is stiff and sore at the end of each workday. He also stated that the medical expenses which he did not pay himself were paid for by the group health insurance provided by his wife's employer. Tower asserts that of the $165,167.54 that was billed for medical services rendered to the claimant, his wife's group health insurance carrier paid $52,671.82, he paid $1,183.27, and the health care providers wrote off $111,298.35 of their charges.

With respect to his working hours prior to June 30, 2005, the claimant testified that he worked mandatory overtime. According to the claimant, "overtime was a mandatory part of the job" and an employee was subject to discipline if he refused to work overtime. He admitted, however, that the amount of overtime which he worked varied weekly.

Following the arbitration hearing, the arbitrator found that the claimant sustained injuries that arose out of and in the course of his employment with Tower and, relying upon Dr. Schaible's causation opinions, concluded that the claimant's work activities aggravated and accelerated his preexisting cervical stenosis, resulting in the claimant's need for surgery. The arbitrator awarded the claimant 74²/₇ weeks of TTD and 175 weeks of PPD for a 35% loss of his person as a whole. Both awards were calculated based upon an average weekly wage of $788.66 that included overtime, which the arbitrator found to be "mandatory and a normal element of his [the claimant's] employment." Additionally, the arbitrator ordered Tower to pay $165,289.16 for necessary medical services rendered to the claimant as provided in section 8(a) of the Act (820 ILCS 305/8(a) (West 2004)).

Both the claimant and Tower sought a review of the arbitrator's decision before the Commission. With one commissioner dissenting, the Commission affirmed and adopted the arbitrator's decision.

Tower sought a judicial review of the Commission's decision in the circuit court of Cook County. The circuit court confirmed the Commission's decision, and this appeal followed.

Tower argues that the Commission's finding that the claimant suffered an accident arising out of and in the course of his employment and its finding that the injury to his cervical spine is causally connected to any such accident are against the manifest weight of the evidence. According to Tower, the evidence of record establishes that the claimant's condition of ill-being is degenerative in nature and is not causally related to his work.

An employee's injury is compensable under the Workers' Compensation Act only if it arises out of and in the course of the employment. 820 ILCS 305/2 (West 2004). Both elements must be present at the time of the claimant's injury in order to justify compensation. *Illinois Bell Telephone Co. v. Industrial Comm'n*, 131 Ill. 2d 478, 483, 546 N.E.2d 603 (1989). "Arising out of the employment" refers to the origin or cause of the claimant's injury. *Caterpillar Tractor Co. v. Industrial Comm'n*, 129 Ill. 2d 52, 58, 541 N.E.2d 665 (1989). "In the course of the employment" refers to the time, place, and circumstances under which the claimant is injured. *Scheffler Greenhouses, Inc. v. Industrial Comm'n*, 66 Ill. 2d 361, 366, 362 N.E.2d 325 (1977). The question of whether an employee's injury arose out of and in the course of his employment is one of fact, and the Commission's resolution of the issue will not be disturbed on review unless it is against the manifest weight of the evidence. *Johnson Outboards v. Industrial Comm'n*, 77 Ill. 2d 67, 70-71, 394 N.E.2d 1176 (1979).

Employers take their employees as they find them. *O'Fallon School District No. 90 v. Industrial Comm'n*, 313 Ill. App. 3d 413, 417, 729 N.E.2d 523 (2000). To result in compensation under the Act, a claimant's employment need only be a causative factor in his condition of ill-being; it need not be the sole cause or even the primary cause. *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 205, 797 N.E.2d 665 (2003). "[A] preexisting condition does not prevent recovery under the Act if that condition was aggravated or accelerated by the claimant's employment." *Caterpillar Tractor Co. v. Industrial Comm'n*, 92 Ill. 2d 30, 36, 440 N.E.2d 861 (1982).

Whether a causal connection exists between a claimant's condition of ill-being and his employment and whether his injuries are attributable to an aggravation or acceleration of a preexisting condition are also factual issues to be decided by the Commission, and unless contrary to the manifest weight of the evidence, the Commission's resolution of such issues will not be set aside on review. *Sisbro, Inc.*, 207 Ill. 2d at 205; *Certi-Serve, Inc. v. Industrial Comm'n*, 101 Ill. 2d 236, 244, 461 N.E.2d 954 (1984).

For a finding of fact made by the Commission to be found to be against the manifest weight of the evidence, an opposite conclusion

must be clearly apparent. *Swartz v. Industrial Comm'n*, 359 Ill. App. 3d 1083, 1086, 837 N.E.2d 937 (2005). Whether this court might have reached the same conclusion is not the test of whether the Commission's determination of a question of fact is against the manifest weight of the evidence. Rather, the appropriate test is whether there is sufficient evidence in the record to support the Commission's determination. *Benson v. Industrial Comm'n*, 91 Ill. 2d 445, 450, 440 N.E.2d 90 (1982).

In this case, the claimant testified that his duties for Tower required him to constantly move his head from side to side while operating a forklift. He began to experience adverse symptoms in May or June of 2005 which included tingling and numbness in his hands and arms. Subsequently, in July of 2005, he was diagnosed with cervical radiculopathy in addition to carpal tunnel syndrome. There is no disputing the fact that the claimant suffered from a degenerative condition of the cervical spine which predated his symptoms of May or June of 2005. However, Dr. Schaible, one of the claimant's treating physicians, opined that the claimant's job duties could have aggravated or accelerated the preexisting condition in his cervical spine.

Drs. Lim and Baylis attributed the claimant's cervical condition to a preexisting degenerative condition. Nevertheless, relying upon the testimony of the claimant and Dr. Schaible's opinions, the Commission found that the claimant's work activities aggravated and accelerated his preexisting cervical stenosis, necessitating surgical intervention. Based upon that finding, the Commission concluded that the claimant's current condition of ill-being arose out of and in the course of his employment with Tower and is causally related thereto.

Tower contends that Dr. Schaible's causation opinion should not have been relied upon because it was rendered in excess of one year after he began treating the claimant and was based upon the inaccurate assumption that the claimant had been operating a forklift for 8 to 10 years. Tower notes that the claimant had been hired less than one year prior to the onset of his symptoms. However, it neglects to acknowledge that Dr. Baylis's progress notes also reflect that the claimant had been a forklift driver "for quite a long time."

Distilled to their finest, Tower's arguments on these issues are nothing more than arguments of credibility and weight. It asserts that the causation opinions of Drs. Lim and Baylis are more persuasive than Dr. Schaible's opinion, and their opinions should have been relied upon by the Commission. However, it was the function of the Commission to judge the credibility of the witnesses, determine the weight to be given their testimony, and resolve conflicting medical evidence. *O'Dette v. Industrial Comm'n*, 79 Ill. 2d 249, 253, 403 N.E.2d 221

(1980). Based upon the record before us, we are unable to conclude that the Commission's reliance upon Dr. Schaible's causation opinion and its conclusion that the claimant's current condition of ill-being arose out of and in the course of his employment are against the manifest weight of the evidence, as an opposite conclusion is not clearly apparent.

Tower further argues that the Commission's awards of TTD benefits, PPD benefits, and reimbursement for medical expenses are also against the manifest weight of the evidence. However, since these arguments are based solely upon the premise that the Commission's causation finding is erroneous, a premise we have already rejected, we also reject these contentions without further analysis.

Next, Tower argues that the Commission's calculation of the claimant's average weekly wage for purposes of computing the TTD and PPD benefits to which he is entitled is both contrary to law and against the manifest weight of the evidence as it failed, in violation of section 10 of the Act (820 ILCS 305/10 (West 2004)), to exclude compensation which the claimant received for working overtime. The Commission fixed the claimant's average weekly wage at $788.66, whereas Tower contends that $521.32 is the appropriate calculation after the claimant's overtime pay is excluded.

In *Airborne Express, Inc. v. Illinois Workers' Compensation Comm'n*, 372 Ill. App. 3d 549, 554, 865 N.E.2d 979 (2007), this court held that those hours which an employee works in excess of his regular weekly hours of employment are not considered overtime within the meaning of section 10 and are to be included in an average-weekly-wage calculation if the excess number of hours worked is consistent *or* if the employee is required to work the excess hours as a condition of his employment. The claimant testified that working overtime at Tower was mandatory, and if an employee refused to work overtime, he was subject to discipline, including termination. We find nothing in the record contradicting the claimant's testimony in this regard. We conclude, therefore, that the Commission's calculation of the claimant's average weekly wage is neither contrary to law nor against the manifest weight of the evidence.

Finally, we address Tower's argument that the Commission's award of $165,289.16 to the claimant under section 8(a) of the Act for reasonable and necessary medical services is erroneous as a matter of law. The amount awarded to the claimant is the total amount that he was billed for medical services, not the amount that the medical service providers were actually paid. According to Tower, the claimant's wife's group health insurance carrier paid $52,671.82 of the charges, the claimant paid $1,183.27, and the medical service providers wrote off

the $111,298.35 balance of their charges. Tower contends that the maximum that it can be required to reimburse the claimant for medical expenses is the amount that was actually paid to the service providers. We agree.

At all times relevant to this case, section 8(a) of the Act provided that "[t]he employer shall provide and pay for all the necessary first aid, medical and surgical services, and all necessary medical, surgical and hospital services thereafter incurred, limited, however, to that which is [necessary] to cure or relieve from the effects of the accidental injury." 820 ILCS 305/8(a) (West 2004). As in all cases of statutory construction, our function is to ascertain and give effect to the intent of the legislature. *Airborne Express, Inc.*, 372 Ill. App. 3d at 553. When, as in this case, the language of a statute is clear, we will give it effect as written. *Airborne Express, Inc.*, 372 Ill. App. 3d at 553.

Section 8(a) requires an employer to "provide and pay" for all first aid, medical, surgical, and hospital services necessary to cure or relieve an injured employee from the effects of a work-related accidental injury. By paying, or reimbursing an injured employee, for the amount actually paid to the medical service providers, the plain language of the statute is satisfied.

Nevertheless, the claimant contends that he is entitled to be reimbursed for the total amount billed by the medical service providers, regardless of the amount which they accepted in payment for their services. Relying upon the "collateral source rule," he argues that Tower is not entitled to a reduction in the amount which it is required to pay for his medical expenses by reason of discounts or write-offs of the medical providers' charges which were secured by his wife's group health insurance carrier, as Tower did not contribute to the payment of the premiums for that group health insurance policy. However, the flaw in the claimant's argument is exposed by an understanding of the rationale underlying the collateral source rule as compared to the purpose of the Act.

" 'Under the collateral source rule, benefits received by [an] injured party from a source wholly independent of, and collateral to, the tortfeasor will not diminish damages otherwise recoverable from the tortfeasor.' " *Arthur v. Catour*, 216 Ill. 2d 72, 78, 833 N.E.2d 847 (2005) (quoting *Wilson v. Hoffman Group, Inc.*, 131 Ill. 2d 308, 320, 546 N.E.2d 524 (1989)); see also *Wills v. Foster*, 229 Ill. 2d 393, 399, 892 N.E.2d 1018 (2008). The justification for this rule is that a tortfeasor should not benefit from the expenditures made by the injured party, or for his benefit, or take advantage of contracts that may exist for the benefit of the injured party, where the tortfeasor did not contribute to the cost of the contract. *Arthur*, 216 Ill. 2d at 79; *Wilson*,

131 Ill. 2d at 320; *Peterson v. Lou Bachrodt Chevrolet Co.*, 76 Ill. 2d 353, 362, 392 N.E.2d 1 (1979), *overruled on other grounds by Willis*, 229 Ill. 2d at 414-15. "[A] benefit that is directed to [an] injured party should not be shifted so as to become a windfall for the tortfeasor." Restatement (Second) of Torts §920A cmt. b (1979); see also *Arthur*, 216 Ill. 2d at 78-79 (quoting the Restatement).

The Act is a remedial statute enacted to abrogate the common law rights and liabilities which previously governed an injured employee's ability to recover damages from his employer. *Sharp v. Gallagher*, 95 Ill. 2d 322, 326, 447 N.E.2d 786 (1983). It established a system of liability without fault under which injured employees gave up their common law rights to sue their employers in tort in exchange for the right to recover for injuries arising out of and in the course of their employment without regard to any fault on their part. Employers gave up their right to interpose the numerous common law defenses to an action by an injured employee, and their liability became fixed without regard to the absence of fault on their part. *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 180, 384 N.E.2d 253 (1978). Unlike an action in tort, there is no wrongdoer or tortfeasor in a claim brought pursuant to the Act.

As it relates to the obligation of an employer to provide or pay for the reasonable and necessary medical care for an injured employee, the purpose of the Act is to relieve the employee and his family of the costs and burdens of such care. *Colclasure v. Industrial Comm'n*, 14 Ill. 2d 455, 458, 153 N.E.2d 33 (1958). By limiting an employer's obligation under section 8(a) of the Act to the amount actually paid to the providers of the first aid, medical, surgical, and hospital services necessary to cure or relieve an injured employee from the effects of an accidental injury, the purpose of the Act has been satisfied; that is to say, both he and his family have been relieved of the cost and burdens of that care. It is for this reason that we now hold that the collateral source rule is not applicable to the right to recover under the Act.

Although our resolution of this issue is one of first impression, it is of limited future significance, as the legislature has seen fit to amend section 8(a) of the Act to provide that employers are obligated to provide and pay "the negotiated rate, if applicable, or the lesser of the health care provider's actual charges or according to a fee schedule, subject to Section 8.2, in effect at the time the service was rendered for all the necessary first aid, medical and surgical services, and all necessary medical, surgical and hospital services thereafter incurred, limited, however, to that which is [necessary] to cure or relieve from the effects of the accidental injury." 820 ILCS 305/8(a) (West 2006). This amendatory change to section 8(a) of the Act is applicable to

claims for accidental injuries that occur on or after February 1, 2006. Pub. Act 94—0277 (eff. July 20, 2005) (amending 820 ILCS 305/8(a) (West 2004)).

For the foregoing reasons, we: reverse that portion of the circuit court's judgment which confirmed the Commission award to the claimant of $165,289.16 for reasonable and necessary medical expenses; affirm the circuit court's judgment in all other respects; vacate the Commission award to the claimant of $165,289.16 for reasonable and necessary medical expenses; and remand this matter to the Commission with directions to award the claimant the amount actually paid to the providers of medical services rendered to him as a result of his injuries of June 30, 2005, and to require Tower to pay and hold the claimant harmless from the payment of any reasonable future medical expenses necessary to cure or relieve him from the effect of his accidental injury of June 30, 2005.

Circuit court affirmed in part and reversed in part, Commission's decision vacated in part, and cause remanded to the Commission with directions.

JUSTICE STEWART, concurring in part and dissenting in part:

I concur in all aspects of the majority decision except the determination that the collateral source rule does not apply to claims under the Workers' Compensation Act. From that portion of the majority decision, I respectfully dissent.

Although the majority treats this as a matter of first impression, it is my belief that our supreme court has addressed this issue. In *Hill Freight Lines, Inc. v. Industrial Comm'n*, 36 Ill. 2d 419, 223 N.E.2d 140 (1967), the claimant's medical bills had been paid through the Union Health and Welfare Fund, which operated a medical and hospital benefit plan for its members. The employer argued that it should not be required to "reimburse an employee for medical bills which have never been tendered to him for payment and which are not shown to be his debts." *Hill Freight Lines, Inc.*, 36 Ill. 2d at 423, 223 N.E.2d at 143. The supreme court held as follows:

> "It is our opinion that the reasonable value of the medical services rendered to an employee are recoverable against the party causing the injury, regardless of whether the employee pays for the medical services by cash, credit or some insurance or benefit plan. As he did not receive the insurance benefits gratuitously and the reasonable value of the medical and hospital services rendered herein were proven, the employer's contention is without merit." *Hill Freight Lines, Inc.*, 36 Ill. 2d at 423-24, 223 N.E.2d at 143.

Although the collateral source rule was not directly addressed, the principle espoused is the same. In a claim under the Act, the employee recovers "the reasonable value of the medical services rendered" regardless of whether the bills were paid through a third-party insurance or benefit plan. Accordingly, this court has consistently applied a standard of reasonableness to determine the amount an employer is required to pay for medical expenses. *Nabisco Brands, Inc. v. Industrial Comm'n*, 266 Ill. App. 3d 1103, 1108, 641 N.E.2d 578, 583 (1994). "The proper standard is that which is usual and customary for similar services in the community where the services were rendered." *Nabisco Brands, Inc.*, 266 Ill. App. 3d at 1108-09, 641 N.E.2d at 583.

As the majority notes, the version of section 8(a) of the Act in effect on the date of the claimant's industrial accident provided that "[t]he employer shall provide and pay for all the necessary first aid, medical and surgical services, and all necessary medical, surgical and hospital services thereafter incurred, limited, however, to that which is [necessary] to cure or relieve from the effects of the accidental injury." 820 ILCS 305/8(a) (West 2004). I agree with the majority that it is our function to ascertain and give effect to the intent of the legislature. However, couching its decision in terms of statutory construction, the majority transforms a requirement that the employer pay its employees' medical bills incurred as a result of an industrial accident into a provision that only requires payment of whatever discounted amount the medical providers are required to accept through contractual agreements or, perhaps, government benefit plans. In my view, the majority misinterprets the statute.

The Act contains no provision which prevents the application of the collateral source rule to workers' compensation claims. Although the legislature has amended the Act on numerous occasions, it has not expressly restricted the application of the collateral source rule in claims under the Act, despite having done so in other areas. See 735 ILCS 5/2—1205 (West 2008). In determining legislative intent, "[a] court presumes that the legislature amends a statute with knowledge of judicial decisions interpreting the statute." *Hubble v. Bi-State Development Agency of the Illinois-Missouri Metropolitan District*, 238 Ill. 2d 262, 273, 938 N.E.2d 483, 492 (2010). Thus, the failure of the legislature to expressly restrict application of the collateral source rule, with presumptive knowledge of case law requiring that an employer pay the reasonable value of medical services rendered to an employee in claims under the Act, indicates legislative acquiescence in the court's interpretation of the Act.

Further, as the majority points out, when section 8(a) was amended in 2005, the legislature expressly required that the employer

pay the lesser of the health care provider's actual charges or the amount set forth in the fee schedule. 820 ILCS 305/8(a) (West 2006). No provision was made for a reduction of the amount billed to the amount paid to the medical provider through a third-party health insurance contract. "In ascertaining legislative intent, courts may consider subsequent amendments to a statute." *City of East Peoria v. Group Five Development Co.*, 87 Ill. 2d 42, 46, 429 N.E.2d 492, 494 (1981). Finally, "in determining legislative intent, a court may properly consider not only the language of the statute, but also the purpose and necessity for the law, the evils sought to be remedied and the goals to be achieved, and the consequences that would result from construing the statute one way or the other." *Hubble*, 238 Ill. 2d at 268, 938 N.E.2d at 489. I believe the majority decision thwarts a fundamental policy consideration underlying the Act. One of the purposes of the Act is to ensure that " 'the burdens of caring for the casualties of industry should be borne by industry and not by the individuals whose misfortune arises out of the industry, nor by the public.' " *Boyer-Rosene Moving Service v. Industrial Comm'n*, 48 Ill. 2d 184, 186, 268 N.E.2d 415, 417 (1971) (quoting *Hoeffken Brothers, Inc. v. Industrial Comm'n*, 31 Ill. 2d 405, 407-08, 202 N.E.2d 5, 6 (1964)). In determining that the collateral source rule does not apply to workers' compensation cases, the majority allows employers to reap the benefit of bargains to which they were not parties, and thereby shift the burden of caring for the casualties of industry to others. Further, the majority provides an incentive for employers to deny claims in anticipation of receiving the benefit of a reduced charge negotiated by a third party.

Here, the employer refused to pay the claimant's medical bills, so he had no choice but to submit them for payment by his wife's group health insurance carrier. At the arbitration hearing, the employer did not object to the admission of the claimant's medical bills on the ground that they were unreasonable. Rather, the employer's objections were limited to liability, causal connection, and whether it should reap the benefits of the discounts provided the claimant's insurance carrier. I believe the Commission correctly ordered the employer to pay the full reasonable amount of the claimant's medical bills.

For the foregoing reasons, I would affirm in all respects the decision of the circuit court confirming the decision of the Commission.