# Illinois Official Reports

## Appellate Court

*Mansfield v. Illinois Workers' Compensation Comm'n*, 2013 IL App (2d) 120909WC

| | |
|---|---|
| Appellate Court Caption | CINDY MANSFIELD, Appellant and Cross-Appellee, v. THE ILLINOIS WORKERS' COMPENSATION COMMISSION *et al.* (Naperville Park District, Appellee and Cross-Appellant). |
| District & No. | Second District<br>Docket No. 2-12-0909WC |
| Filed | November 21, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The Workers' Compensation Commission's award of 10% loss of the person as a whole for the back injury claimant suffered in a work-related fall was not against the manifest weight of the evidence, but the portion of the judgment modifying the calculation of claimant's average weekly wage to include her income from teaching piano lessons from her home was reversed and the cause was remanded for redetermination of the average weekly wage and benefits to which claimant was entitled. |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 11-MR-1459; the Hon. Terence M. Sheen, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded with directions. |

Counsel on
Appeal

Anthony L. Russo, Sr., of Russo & Russo, Ltd., of Wheaton, for
appellant.

Jeffrey B. Huebsch, of Power & Cronin, Ltd., of Oak Brook, for
appellee.

Panel

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice Holdridge and Justices Hoffman, Hudson, and
Stewart concurred in the judgment and opinion.

**OPINION**

¶ 1        On March 19, 2004, claimant, Cindy Mansfield, filed two applications for adjustment of claim pursuant to the Workers' Compensation Act (Act) (820 ILCS 305/1 through 30 (West 2002)), seeking benefits from the employer, Naperville Park District, for injuries suffered to her low back, legs, neck, and arms on July 23, 2003 (No. 04WC13562), and on September 9, 2003 (No. 04WC13563).

¶ 2        Following a consolidated hearing, an arbitrator issued a separate decision for each case. Regarding the injury suffered on July 23, 2003, the arbitrator found that claimant proved she sustained injuries arising out of and in the course of her employment with the employer on that date. Specifically, the arbitrator found claimant "suffered a lumbar strain as a result of the initial injury on July 23, 2003, and that a causal relationship existed between said work injury and her condition of ill-being up through the date of the second injury on September 9, 2003, the subject of claim 04 WC 13563." However, the arbitrator found claimant failed to prove she was entitled to temporary total disability (TTD) benefits and medical expenses from July 23, 2003, the date of the first accident, to September 9, 2003, the date of the second accident. The arbitrator stated his intent to address the issue of the nature and extent of claimant's injuries in his order in case No. 04WC13563. Neither party sought review of the arbitrator's decision (No. 04WC13562) before the Commission.

¶ 3        Regarding the injury suffered on September 9, 2003 (No. 04WC13563), the arbitrator found claimant proved she sustained injuries arising out of and in the course of her employment with the employer on September 9, 2003, and "a causal relationship existed between the accident on September 9, 2003 and Petitioner's current condition of ill-being, including the need for the surgery she eventually underwent on December 13, 2004." The arbitrator determined claimant's average weekly wage was $437.50, and awarded claimant TTD benefits in the amount of $291.67 per week, from September 9, 2003, through July 5,

- 2 -

2005; permanent partial disability (PPD) benefits in the amount of $262.50 per week for 125 weeks, representing 25% loss of her person as a whole; and medical expenses in the amount of $108,554.15.

¶ 4 The employer filed a petition for review of the arbitrator's decision (case No. 04WC13563) before the Illinois Workers' Compensation Commission (Commission). On review, the Commission modified the arbitrator's decision finding claimant failed to prove a causal relationship between her injury on September 9, 2003, and her condition of ill-being after April 30, 2004. The Commission awarded claimant TTD benefits in the amount of $291.67 per week, from September 11, 2003, through April 12, 2004; PPD benefits in the amount of $262.50 per week for 50 weeks, representing 10% loss of her person as a whole; and medical expenses in the amount of $5,416.54. The Commission otherwise affirmed and adopted the arbitrator's decision.

¶ 5 Thereafter, both claimant and the employer filed petitions seeking judicial review in the circuit court of Du Page County. The circuit court modified the Commission's decision, finding claimant's average weekly wage was $517.56 and directing the Commission "to recalculate the average weekly wage and the benefits allowed in conformity with this Opinion." The court otherwise confirmed the Commission's decision.

¶ 6 Claimant appeals, arguing the Commission's findings regarding causation, average weekly wage, TTD benefits, PPD benefits, and medical expenses are against the manifest weight of the evidence. The employer cross-appeals, arguing the Commission incorrectly calculated claimant's average weekly wage as including profits from claimant's self-employment providing piano lessons in her home.

¶ 7 I. BACKGROUND

¶ 8 The following factual recitation is taken from the evidence presented at the consolidated arbitration hearing.

¶ 9 The 47-year-old claimant testified that she began work teaching various preschool classes for the employer in approximately 1999. Claimant worked between 12 and 20 hours each week depending on class offerings and student enrollment. Claimant also taught piano in her home. She worked approximately the same number of hours from home as for the employer.

¶ 10 On July 23, 2003, claimant assisted two-year-olds with a program for their parents. Near the end of the program, claimant felt a child standing immediately behind her. In an effort to avoid falling on the child, claimant leaped back and fell on her low back, bottom, and arm. As a result, claimant experienced soreness in her back, arms, and shoulders. According to a wage statement prepared by the employer, claimant continued to work, reporting 9.75 hours worked for the pay period including July 26, 2003, through August 8, 2003. Claimant testified she did not seek immediate treatment because she thought she had bruised something and it would heal.

¶ 11 Claimant testified she had never injured her back prior to July 23, 2003, and did not have chronic problems with her back. Claimant identified her family doctor as Dr. Brian O'Leary, an internist. Claimant first treated with Dr. O'Leary in approximately 1994. Dr. O'Leary's

treatment notes on April 18, 1994, reference claimant's 15-year history of muscle pain in the low back, and at times, in the neck and upper back. The treatment notes from 1994 through approximately 2008 make multiple references to claimant's fibromyalgia.

¶ 12    Claimant remained sore and at the direction of the employer sought treatment on August 7, 2003, with Dr. Vimal Patel, a doctor of osteopathy at Edward Corporate Health. Dr. Patel noted (1) tenderness bilaterally over the SI joint and (2) the lumbar spine X-rays were normal. Dr. Patel diagnosed lumbar strain and bilateral SI strain. He prescribed naproxen and a course of physical therapy. Dr. Patel's medical notes state that claimant was off of school and, thus, did not require specific work restrictions. A physical therapy evaluation prepared on August 8, 2003, states claimant suffered from chronic right knee pain, fibromyalgia, and hypertension, and had multiple abdominal surgeries. Claimant returned to Dr. Patel on August 21, 2003. She reported attending four physical therapy sessions and that it had helped significantly. Dr. Patel's treatment note states that claimant "for the most part *** feels better." Dr. Patel recommended one more week of physical therapy and no restrictions. Claimant was to resume work in September 2003, with the fall programming session. Claimant last attended physical therapy through Edward Hospital on September 4, 2003. A physical therapy summary noted claimant had attended four of nine visits.

¶ 13    The employer began new class offerings on September 8, 2003, and claimant resumed teaching for the employer. On September 9, 2003, claimant reached for a toddler who was running toward a classroom door and "fell into the door and made [her] back worse." Claimant sought treatment from chiropractor Dr. Brad Pins on September 11, 2003. Claimant gave a history of the work accident on July 23, 2003. Dr. Pins' treatment notes reference a "continuing trauma" following the work accident on July 23, 2003, and include a reference to the work accident on September 9, 2003. Dr. Pins recommended "extreme limited duty" on September 11, 2003, and removed claimant from work on February 12, 2004. Dr. Pins treated claimant two or three times a week until April 12, 2004. Claimant experienced pain throughout her treatment with Dr. Pins and reported minimal improvement.

¶ 14    Claimant underwent a magnetic resonance imaging (MRI) of her lower back on September 16, 2003, read by chiropractic radiologist Dr. John A. Aikenhead. Dr. Aikenhead's impression was L5-S1 left lateral herniation compromising the canal and the foramen and small Modic changes at the adjacent endplates.

¶ 15    On September 22, 2003, claimant completed an initial patient history with the Synergy Institute, a physical therapy provider. Claimant identified fibromyalgia as a previous injury. Further, claimant wrote she was unable to work for the employer because she could not pick up the children but she was teaching piano at home, although in pain. Claimant identified a herniated disc as her major complaint and reported losing work days since her July 2003 accident.

¶ 16    On October 28, 2003, claimant was examined by Dr. David Spencer, at the request of the employer. Dr. Spencer is an orthopedic surgeon with a spine surgery practice at Lutheran General Hospital, Park Ridge, Illinois. According to his treatment notes, claimant reported work accidents on July 23, 2003, and September 9, 2003. Claimant did not seek immediate treatment following the July 2003 accident because she had a history of back pain and

- 4 -

fibromyalgia and based on that history, believed she would get better. In a pain diagram, claimant noted occasional right leg "pins and needles," constant stabbing pain across the low back, and constant low back aching on the left side. The September 16, 2003, MRI showed degenerative changes and a small disc herniation on the left at L5-S1 without neurologic compromise. Dr. Spencer recommended claimant remain off work and prescribed four additional weeks of physical therapy. Dr. Spencer anticipated claimant would return to full activities without limitations following therapy.

¶ 17    Dr. Spencer's medical notes dated November 25, 2003, state claimant was improving and should continue physical therapy and remain off work until January 1, 2004. In a physical therapy reevaluation dated December 28, 2003, claimant reported she felt better overall but had regressed since her last session because she had cared for her sick children at home and stood in heels while attending a Christmas party. Dr. Spencer's medical notes dated January 8, 2004, state claimant was improving and would participate in a work-hardening program for three to four weeks, and then return to full-duty work. Claimant did not return to work.

¶ 18    At his deposition, Dr. Spencer opined that claimant "had a chronic pain syndrome and that she had suffered a back sprain or strain when she had misadventures at work and aggravated her back pain, and then it had largely resolved and that she would be left with her chronic fibromyalgia pain." Dr. Spencer characterized as "rather unbelievable" and "not physiologic" a report by claimant that sometime after she last treated with Dr. Spencer on January 8, 2004, she fell 6 to 8 times over the course of approximately 10 days due to a sharp pain in her back and leg. Claimant attributed her pain to a herniated disc. Dr. Spencer knew of no individual who "fell down uncontrollably because they had a disc herniation." Further, claimant's complaints were not consistent with a left-sided disc herniation. Dr. Spencer stated that the surgery claimant ultimately underwent in December 2004 was not related to the July 2003 and September 2003 work accidents.

¶ 19    Dr. O'Leary referred claimant for treatment with board-certified neurosurgeon Dr. Michael Rabin. In a report dated December 5, 2003, Dr. Rabin found claimant's September 2003 MRI "largely unremarkable." He noted some degeneration but no focal areas of compression and no disc herniations. Dr. O'Leary recommended claimant resume chiropractic manipulations "since that appeared to be leading to improvement."

¶ 20    Claimant testified she worked light duty for the employer from April 13, 2004, through November 12, 2004.

¶ 21    Dr. Pins referred claimant for treatment with Dr. Steven Mather, an orthopedic surgeon. In treatment notes dated April 15, 2004, Dr. Mather noted his review of claimant's September 2003 MRI, showing "a markedly degenerative disc at L5/S1 with a small left-sided herniation present." At the direction of Dr. Mather, claimant underwent a second MRI on April 22, 2004, which confirmed degenerative disc disease at L5-S1, with a circumferential disc bulge and moderate bilateral neural foraminal stenosis.

¶ 22    On April 30, 2004, claimant was examined by Dr. Andrew Zelby at the request of the employer. Dr. Zelby testified that he is a board-certified neurologist and reviewed the cervical, thoracic, and lumbar spine X-rays, and the MRI scans. Dr. Zelby found that claimant had degenerative disc disease at L5-S1. He did not agree with the chiropractic radiologist's

interpretation of the 2003 MRI scan. According to Dr. Zelby, the 2003 MRI scan did not show a herniated disc. He opined that based upon claimant's medical records, claimant was symptomatic before her July 2003 injury and the accident did not accelerate her degenerative disc disease beyond its normal progression. Upon physical examination, Dr. Zelby found many aspects of the exam were consistent with symptom amplification. He stated that claimant had likely reached maximum medical improvement three to four months following the July 2003 accident.

¶ 23    Claimant next sought treatment with Dr. Aruna Ganju, a neurosurgeon affiliated with Northwestern Memorial Hospital. In a treatment note dated June 10, 2004, Dr. Ganju diagnosed claimant with lumbar spondylosis at L5-S1 and recommended an epidural steroid injection and aquatic therapy. In treatment notes dated July 22, 2004, Dr. Ganju diagnosed claimant with degenerative disc disease, severe at L5-S1. On August 12, 2004, claimant reported to Dr. Ganju that she had been undergoing aquatic therapy and had three epidural steroid injections. Claimant reported her pain level as not tolerable. On September 23, 2004, claimant underwent a discogram and postdiscogram computed tomography (CT) scan of the lumbar spine, which revealed moderate to severe disc degeneration at the L5-S1 level.

¶ 24    Dr. Ganju referred claimant to Dr. John Liu, a neurosurgeon also affiliated with Northwestern Memorial Hospital who specializes in artificial disc replacement. On November 4, 2004, Dr. Liu noted that claimant had undergone "extensive conservative treatments" for more than a year and continued to experience severe low back pain. Dr. Liu recommended claimant undergo surgery. Claimant underwent an anterior discectomy and fusion of the L5-S1 disc space on December 13, 2004, and was returned to full-duty work on July 7, 2005. In his evidence deposition on November 6, 2007, Dr. Liu opined that claimant's low back pain worsened after her July 2003 accident and, thus, contributed to claimant's current state of ill-being. Dr. Liu stated he did not have any information regarding the second accident on September 9, 2003.

¶ 25    Following the consolidated hearing, the arbitrator found claimant proved her current condition of ill-being was causally related to her work accidents on July 23, 2003, and September 9, 2003. Specifically, the arbitrator found the accidents aggravated claimant's preexisting degenerative condition necessitating surgery on December 13, 2004. The arbitrator determined claimant's average weekly wage was $437.50, and awarded claimant benefits through July 5, 2005. The employer sought review only of the arbitrator's decision regarding the injury suffered on September 9, 2003. The Commission modified the arbitrator's decision, relying on the opinions of Dr. Spencer and Dr. Zelby that claimant had suffered a temporary aggravation of a chronic condition and was at maximum medical improvement on April 30, 2004. The Commission awarded claimant TTD benefits through April 12, 2004, "the period she was authorized off work by chiropractor Dr. Pins," and found claimant permanently disabled to the extent of 10% of the person as a whole. Thereafter, both claimant and the employer filed petitions seeking judicial review in the circuit court of Du Page County. The circuit court modified the Commission's decision, calculating claimant's average weekly wage as $517.56 and directing the Commission "to recalculate the average weekly wage and the benefits allowed in conformity with this Opinion." The court otherwise confirmed the

Commission's decision and this appeal and cross-appeal followed.

¶ 26                                    II. ANALYSIS

¶ 27        On appeal, claimant argues the Commission erred in finding her condition of ill-being after April 30, 2004, was not causally related to her September 9, 2003, workplace accident. In a workers' compensation case, the claimant has the burden of proving, by a preponderance of the evidence, some causal relation between her employment and her injury. *Caterpillar Tractor Co. v. Industrial Comm'n*, 129 Ill. 2d 52, 63, 541 N.E.2d 665, 669 (1989). Compensation may be awarded under the Act for a claimant's condition of ill-being even though the conditions of his or her employment do not constitute the sole, or even the principal, cause of injury. *Brady v. Louis Ruffolo & Sons Construction Co.*, 143 Ill. 2d 542, 548, 578 N.E.2d 921, 924 (1991); *Fierke v. Industrial Comm'n*, 309 Ill. App. 3d 1037, 1040, 723 N.E.2d 846, 849 (2000). In order for an injury to constitute an accidental injury within the meaning of the Act, the claimant need only show that some act or phase of the employment was a causative factor of the resulting injury. *Fierke*, 309 Ill. App. 3d at 1040, 723 N.E.2d at 849. The relevant question is whether the evidence supports an inference that the accidental injury aggravated the condition or accelerated the processes that led to the claimant's current condition of ill-being. *Mason & Dixon Lines, Inc. v. Industrial Comm'n*, 99 Ill. 2d 174, 181-82, 457 N.E.2d 1222, 1226 (1983); *Freeman United Coal Mining Co. v. Industrial Comm'n*, 318 Ill. App. 3d 170, 173-74, 741 N.E.2d 1144, 1147 (2001).

¶ 28        Whether a causal relationship exists between a claimant's employment and his injury is a question of fact to be resolved by the Commission. *Certi-Serve, Inc. v. Industrial Comm'n*, 101 Ill. 2d 236, 244, 461 N.E.2d 954, 958 (1984). The Commission's determination on a question of fact will not be disturbed on review unless it is against the manifest weight of the evidence. *Orsini v. Industrial Comm'n*, 117 Ill. 2d 38, 44, 509 N.E.2d 1005, 1008 (1987). For a finding of fact to be contrary to the manifest weight of the evidence, an opposite conclusion must be clearly apparent. *Caterpillar, Inc. v. Industrial Comm'n*, 228 Ill. App. 3d 288, 291, 591 N.E.2d 894, 896 (1992).

¶ 29        In support of her assertion of a causal relationship between her September 9, 2003, workplace accident and condition of ill-being after April 30, 2004, claimant contends a medical journal article and medical treatises support a claim that Modic changes in the spine are indicative of an acute injury. At his deposition, Dr. Liu read from the September 2003 MRI report prepared by Dr. Aikenhead. Dr. Aikenhead noted "mild marrow edematous changes" at L5-S1. Dr. Liu volunteered that "mild marrow edematous changes" are "the swelling within the bone marrow" and "[t]hat's what's called a [M]odic change." Dr. Liu did not comment further regarding Modic changes.

¶ 30        In this case, the Commission relied on the opinions of Drs. Spencer and Zelby to find that claimant's condition of ill-being after April 30, 2004, was not causally related to her employment on September 9, 2003. Dr. Spencer testified that claimant reported to him a history of back pain and fibromyalgia. Dr. Spencer opined that claimant "had a chronic pain syndrome and that she had suffered a back sprain or strain when she had misadventures at work and aggravated her back pain, and then it had largely resolved and that she would be left with

- 7 -

her chronic fibromyalgia pain." Dr. Spencer stated that claimant's condition of ill-being after April 30, 2004, was not causally related to her September 2003 work accident. Dr. Zelby examined claimant on April 30, 2004. He reviewed claimant's cervical, thoracic, and lumbar spine X-rays, and the MRI scans. He opined that claimant's condition on April 30, 2004, was not related to her September 2003 work accident. Dr. Zelby found claimant had likely reached maximum medical improvement three to four months following the July 2003 accident.

¶ 31    Although Dr. Liu opined claimant's current condition of ill-being was causally related to her work accident on July 23, 2003, he did not have any information regarding the second accident on September 9, 2003. Claimant offered no medical opinion to support a causation finding regarding the work accident on September 9, 2003. Further, despite claimant's testimony that she had never injured her back prior to July 23, 2003, and did not have chronic back problems, Dr. O'Leary's treatment notes reference a 15-year history of low back pain.

¶ 32    In this case, there is sufficient evidence supporting the Commission's finding that claimant's low back condition after April 30, 2004, was not causally related to the September 9, 2003, workplace accident. It is not our function to reweigh the evidence, and based on the record, we cannot say that an opposite conclusion is clearly apparent. Accordingly, the Commission's finding that claimant's condition of ill-being after April 30, 2004, was not causally related to her September 9, 2003, workplace accident was not against the manifest weight of the evidence.

¶ 33    Claimant also argues that the award of TTD benefits and medical expenses was against the manifest weight of the evidence. However, since these arguments are based upon the premise that the Commission's causation finding was erroneous, these contentions can be rejected without further analysis. *Tower Automotive v. Industrial Workers' Compensation Comm'n*, 407 Ill. App. 3d 427, 436, 943 N.E.2d 153 (2011).

¶ 34    Claimant next argues the Commission's finding with regard to permanency is against the manifest weight of the evidence. We disagree.

¶ 35    A determination of the nature and extent of a claimant's permanent disability is a question of fact to be resolved by the Commission, and its finding in this regard should be given substantial deference and will not be disturbed on appeal unless it is against the manifest weight of the evidence. *Jewel Food Cos. v. Industrial Comm'n*, 256 Ill. App. 3d 525, 534, 630 N.E.2d 865 (1993). However, a claimant is entitled to a disability award only for the nature and extent of his disability that was caused by employment exposure. *Fitts v. Industrial Comm'n*, 172 Ill. 2d 303, 310, 666 N.E.2d 4, 7 (1996).

¶ 36    In this case, the arbitrator awarded claimant permanent disability of 25% after finding "a causal relationship existed between the accident on September 9, 2003 and Petitioner's current condition of ill-being, including the need for the surgery she eventually underwent on December 13, 2004." The Commission modified the arbitrator's decision, finding no causal connection between claimant's work accident on September 9, 2003, and condition of ill-being after April 30, 2004. Although finding no causal connection after April 2004, the Commission still awarded claimant permanent disability of 10%, stating:

"In companion case 04 WC 13562, the Arbitrator chose to decide the issue of nature and extent of permanent disability with this case. Case 04 WC 13562 was not reviewed and became final. The Commission modifies the Arbitrator's Decision finding that Petitioner is permanently disabled to the extent of 10% of the person as a whole."

¶ 37      In case No. 04WC13562, the arbitrator found claimant "suffered a lumbar strain as a result of the initial injury on July 23, 2003, and that a causal relationship existed between said work injury and her condition of ill-being up through the date of the second injury on September 9, 2003, the subject of claim 04 WC 13563." As the Commission stated, neither party sought review of the arbitrator's decision in case No. 04WC13562, and it became final. Given the arbitrator's findings in case No. 04WC13562, the Commission's permanency award of 10% loss of the person as a whole was not against the manifest weight of the evidence.

¶ 38      Claimant next argues the Commission incorrectly calculated her average weekly wage. Claimant argues that her actual earnings should be construed to include the gross profit of her business, SCATHOME. On cross-appeal, the employer argues the Commission incorrectly calculated claimant's average weekly wage as including profits from claimant's self-employment, providing piano lessons in her home.

¶ 39      Section 10 of the Act sets forth the method of calculating compensation as follows:

"The compensation shall be computed on the basis of the 'Average weekly wage' which shall mean the actual earnings of the employee in the employment in which he was working at the time of the injury during the period of 52 weeks ending with the last day of the employee's last full pay period immediately preceding the date of injury, illness or disablement excluding overtime, and bonus divided by 52; but if the injured employee lost 5 or more calendar days during such period, whether or not in the same week, then the earnings for the remainder of such 52 weeks shall be divided by the number of weeks and parts thereof remaining after the time so lost has been deducted. Where the employment prior to the injury extended over a period of less than 52 weeks, the method of dividing the earnings during that period by the number of weeks and parts thereof during which the employee actually earned wages shall be followed. Where by reason of the shortness of the time during which the employee has been in the employment of his employer or of the casual nature or terms of the employment, it is impractical to compute the average weekly wages as above defined, regard shall be had to the average weekly amount which during the 52 weeks previous to the injury, illness or disablement was being or would have been earned by a person in the same grade employed at the same work for each of such 52 weeks for the same number of hours per week by the same employer. *** When the employee is working concurrently with two or more employers and the respondent employer has knowledge of such employment prior to the injury, his wages from all such employers shall be considered as if earned from the employer liable for compensation." 820 ILCS 305/10 (West 2002).

¶ 40      The employer contends claimant's business income should not be included in the calculation of the average weekly wage because it does not represent "wages" earned while

working for an "employer." We agree. We find the very similar case of *Paoletti v. Industrial Comm'n*, 279 Ill. App. 3d 988, 996, 665 N.E.2d 507, 512 (1996), to be dispositive.

¶ 41     In *Paoletti*, the claimant sustained an injury to his back while working as a refuse scavenger for the employer. *Paoletti*, 279 Ill. App. 3d at 991, 665 N.E.2d at 509. The claimant also owned a landscaping business operated as a subchapter S corporation for which he performed both administrative work and manual labor. *Paoletti*, 279 Ill. App. 3d at 995-96, 665 N.E.2d at 511-12. As in this case, the claimant's tax returns showed the business did not pay him any wage or salary, but he did receive the net profits. *Paoletti*, 279 Ill. App. 3d at 996, 665 N.E.2d at 512. This court noted that "[t]he question of whether net profits should be considered in calculating a claimant's average weekly wage is of first impression in Illinois." *Paoletti*, 279 Ill. App. 3d at 996, 665 N.E.2d at 512. In holding that the claimant's business profits should not be included in the calculation of his average weekly wage, this court stated that it "would be legislating from the bench if [it] were to hold that 'actual earnings' should be construed to include net profit." *Paoletti*, 279 Ill. App. 3d at 996, 665 N.E.2d at 512.

¶ 42     Citing to a Tennessee Supreme Court decision, the *Paoletti* court went on to suggest an exception might exist such that business income could be included in the calculation of average weekly wage where evidence was presented of the wage of another employee performing similar duties as claimant. *Paoletti*, 279 Ill. App. 3d at 996, 665 N.E.2d at 512 (citing 2 Arthur Larson, Law of Workmen's Compensation § 60.12(e), at 10-684 through 10-685 (1992), and *P&L Construction Co. v. Lankford*, 559 S.W.2d 793, 795 (Tenn. 1978)). In *Lankford*, the claimant sought benefits under the Tennessee workmen's compensation law from his employer, a closely held corporation of which the claimant and his wife held a 50% interest. *Lankford*, 559 S.W.2d at 794. The claimant, however, received no direct compensation for his labor. The Tennessee Supreme Court rejected the trial court's holding that *Lankford*'s average weekly wage should be based on one-half of the net income of the corporation and instead held "[a] better measure of the employee's earnings would be the compensation paid by the same company to another employee performing the same or similar duties." *Lankford*, 559 S.W.2d at 795.

¶ 43     The *Paoletti* court stated the claimant's business income could not be considered as wages even under the *Lankford* analysis "because the claimant did not present evidence of what the wage would be of another employee performing similar duties as claimant alleged he performed for his landscaping business." *Paoletti*, 279 Ill. App. 3d at 997, 665 N.E.2d at 512.

¶ 44     We note the significant differences between *Paoletti* and *Lankford*. In *Paoletti*, as in the present case, the issue was whether income from the claimant's concurrent employment could be included in computing average weekly wage. In *Lankford*, the claimant was not concurrently employed and the issue related only to the method to be used in calculating his earnings. In fact, Tennessee's workmen's compensation law did not allow for the inclusion of wages from concurrent employment in calculating average weekly wage. In short, we question the relevance of the analysis utilized in *Lankford* to the issues presented in *Paoletti* or here.

¶ 45     Therefore, while we adhere to *Paoletti*'s holding that a claimant's business income should not be included in the calculation of average weekly wage, we decline to further recognize an exception to this holding based on *Lankford*. Accordingly, to the extent the Commission

- 10 -

included net profits of claimant's business in its calculation of her average weekly wage, the Commission erred.

¶ 46 We note the Commission affirmed and adopted the arbitrator's finding that claimant earned from the employer an average weekly wage of $247.97 in the year preceding her injury. Claimant was paid in 19 biweekly installments during the year preceding her injury and had earned $9,422.86. There was no indication in the record regarding how many days she worked during those weeks or how many hours per day she worked. The claimant's average weekly wage was properly calculated by dividing $9,422.86 by 38 (19 biweekly payments) for an average weekly wage of $247.97. We therefore reverse that portion of the circuit court's judgment modifying the Commission's determination of the claimant's average weekly wage, set aside the Commission's decision on the issue of average weekly wage, and remand to the Commission for recalculation of the claimant's average weekly wage and the benefits to which she is entitled which are dependent thereon, and for further proceedings.

¶ 47                                         III. CONCLUSION

¶ 48 We reverse that portion of the circuit court's judgment modifying the Commission's calculation of claimant's average weekly wage, vacate the Commission's calculation of claimant's average weekly wage, and remand the cause to the Commission for determination of claimant's average weekly wage and the weekly benefits to which she is entitled; and we affirm the circuit court's judgment in all other respects.

¶ 49 Affirmed in part and reversed in part; cause remanded with directions.