# Illinois Official Reports

## Appellate Court

---

**_Tolbert v. Illinois Workers' Compensation Comm'n_, 2014 IL App (4th) 130523WC**

---

| | |
|---|---|
| Appellate Court Caption | MARK TOLBERT, Appellant, v. THE ILLINOIS WORKERS' COMPENSATION COMMISSION *et al.* (Prairie Central Cooperative, Appellee). |
| District & No. | Fourth District<br>Docket No. 4-13-0523WC |
| Filed | June 5, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The Workers' Compensation Commission's denial of benefits to claimant for the lung condition he suffered as a result of his exposure to bird feces while cleaning grain bins for the operator of grain elevators was reversed by the appellate court on the ground that the finding was against the manifest weight of the evidence, since the evidence established that airborne dust containing dried bird feces that causes histoplasmosis was present within the areas where claimant worked, the histoplasmosis was a causative factor in the conditions of ill-being claimant suffered at the time of his arbitration hearing, a letter sent to claimant's employer within 45 days of the date claimant learned that his conditions of ill-being were causally related to his exposure to the dust in the workplace satisfied the notice requirements of the statute, and an employer-employee relationship existed at the time of claimant's exposure to the dust; therefore, the cause was remanded for a determination of the temporary total disability and medical and prospective medical benefits due claimant. |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 12-MR-200; the Hon. Rebecca Foley, Judge, presiding. |
| Judgment | Reversed; cause remanded to the Commission. |

| Counsel on Appeal | Tracy L. Jones (argued), of Jim Black & Associates, of Rockford, for appellant. |
|---|---|
| | Edward Januszkiewicz (argued), of Capuani & Schneider, of Chicago, for appellee. |
| Panel | JUSTICE STEWART delivered the judgment of the court, with opinion. Presiding Justice Holdridge and Justices Hoffman, Hudson, and Harris concurred in the judgment and opinion. |

## OPINION

¶ 1 The claimant, Mark Tolbert, worked for the employer, Prairie Central Cooperative. The employer operates grain elevators. At the time of the alleged accidental injury, the claimant's job duties included cleaning and maintaining grain flats, elevators, and bins. The work environment exposed the claimant to significant airborne dust particles that included dried bird droppings. The claimant began suffering from respiratory problems and had to quit working. His doctors subsequently diagnosed him as having a lung condition, histoplasmosis, which is caused by a fungus usually associated with bird droppings. The claimant filed a claim under the Workers' Compensation Act (the Act) (820 ILCS 305/1 *et seq.* (West 2012)).

¶ 2 The arbitrator found that the claimant failed to give timely notice of the accidental injury to the employer and that the claimant failed to prove that his current conditions of ill-being, which include chest pain and breathing problems, were causally related to his exposure to a fungus that causes histoplasmosis at the workplace. The arbitrator also found that the claimant was not entitled to recover for medical expenses or temporary total disability (TTD) benefits. The Illinois Workers' Compensation Commission (Commission) affirmed and adopted the arbitrator's decision and made an additional finding that the claimant failed to prove that he was exposed to histoplasmosis at his workplace. The circuit court entered a judgment confirming the Commission's decision. The claimant now appeals from the circuit court's judgment. For the following reasons, we reverse and remand for further proceedings.

¶ 3 BACKGROUND

¶ 4 The claimant testified that he previously worked for the employer full-time from 1998 until 2008. He began working for the employer again as a seasonal employee on July 28, 2010. At that time, the claimant was 36 years old.

¶ 5        The claimant's medical records indicate that prior to working for the employer in 2010, he underwent a sleep study on April 26, 2010, and was diagnosed with positional obstructed sleep apnea. Also, on July 9, 2010, the claimant saw Dr. Kashyap with complaints of daytime sleepiness. Dr. Kashyap's records indicate that the claimant had a past medical history that included chest pain, headaches, and dizziness. The records indicate that at the time of the examination the claimant did not have any complaints of chest pain. The sleep study records indicate that the claimant reported getting sleepy and tired during the daytime. Dr. Kashyap diagnosed the claimant as having hypersomnia.

¶ 6        When the claimant began working for the employer on July 28, 2010, his job duties included loading train cars with grain, dumping grain trucks, and general maintenance, including cleaning up a grain flat, grain elevators, and grain bins. The claimant testified that a lot of his job duties involved cleaning out a large grain flat that was 660 feet by 300 feet. The flat contained a lot of debris, including bird droppings, and the cleaning work produced a lot of airborne dust. The claimant testified that he saw a lot of pigeons inside the flat. He wore a dust mask while performing his duties, and he testified that he went through three to five dust masks each workday.

¶ 7        The claimant testified that after he started working for the employer in 2010, he started feeling weak, coughing phlegm, having severe chest pains, and suffering from shortness of breath. Although his medical records indicate that he had previously suffered from chest pains, he testified that his previous chest pains were two years prior to August 2010 and were not as severe. He had smoked since he was 15 years old, but testified that he did not have any previous problems with his lungs until working for the employer in 2010.

¶ 8        The claimant testified that on August 26, 2010, he felt weakness and numbness in his hands and feet, as well as shortness of breath and chest pains. Therefore, he went to the emergency room and reported his difficulty breathing and chest pains. August 26, 2010, was the last day he performed any work duties for the employer.

¶ 9        At the arbitration hearing, the claimant presented emergency room records that were dated September 21, 2010. The records from that visit indicate that the claimant reported chest pressure for the past three weeks, as well as shortness of breath and pain that worsened with sitting up. The pain was constant for the past three weeks. The records state that the claimant "[h]ad similar episode of pain 2 years and had negative stress test."

¶ 10        Notes written by the claimant's primary care physician, Dr. Steven Norris, dated September 22, 2010, indicate that the claimant reported steady chest pain for the past three weeks and some shortness of breath. Dr. Norris ordered a series of tests, including a chest X-ray, CAT scan of the chest, and a PET scan. The tests revealed the presence of "two right lower lobe pulmonary nodules" and a "left lower lobe pulmonary nodule." Dr. Norris initially thought that the claimant might be suffering from lung cancer and ordered a biopsy.

¶ 11        Sometime after the claimant first went to the emergency room with complaints of chest pain and shortness of breath, he spoke with the employer's general manager, Mark Heil. The claimant testified that he told Heil that he had been to the emergency room, that his doctor did not want him working around the grain dust, that he was waiting to hear about test results to see what they found, and that he had follow-up appointments with his doctors to go over the test results.

¶ 12        During his testimony, the claimant denied telling Heil that he believed that his condition was related to cancer. According to Heil, however, on September 1, 2010, the claimant came to

his office and told him that he had cancer. Heil testified that, before this meeting with the claimant, he was aware that the claimant was having lung and chest issues because he had heard other people talking about them. Heil testified that the claimant told him that he had medical appointments scheduled for biopsies and tests later that month, and that if he continued to work, the appointments would have to be rescheduled to a later time. Based on his conversation with the claimant, Heil understood that the claimant was leaving his job. He shook the claimant's hand and wished him the best of luck. Heil then sent a text message to the employer's personnel manager to inform her that he had a meeting with the claimant and that the claimant was done working for the employer.

¶ 13    Heil subsequently filled out a "Voluntary Leave Questionnaire" for the Department of Employment Security in which he described the reason the claimant left employment as follows:

> "[The claimant] told us that he had personal health issues that need to be taken care of. We asked that he get an okay from doctor after he told us the doctor told him he needed to tell his employer of his health status. [The claimant] then decided to leave work and then take care of his health issues over the next few weeks to a month."

¶ 14    Heil testified that he did not mention cancer to other employees because the claimant wanted that to be kept confidential. He also testified that the claimant did not ask about any positions that might be available that did not involve working in the grain bins or flats. He believed that if the claimant had not resigned, there were other positions with the employer that the claimant could have performed that did not involve grain dust, including a truck probe operator or performing computer work or other office tasks. The claimant testified that he asked Heil if other jobs were available, but that Heil did not offer him any position that did not involve working in grain dust. Instead, according to the claimant, Heil told him that there were no other jobs available. The claimant testified that he would have accepted such a position if one was available, that he never quit his job, and that no one ever told him that he was fired.

¶ 15    The claimant underwent the lung biopsy on October 4, 2010. The lung biopsy showed that the claimant was suffering from histoplasmosis. In a report dated October 22, 2010, Dr. Norris noted his diagnosis of histoplasmosis and that the claimant presented with symptoms that included shortness of breath, cough with phlegm, chest pain, and weakness. Dr. Norris also wrote as follows: "States that back in late July through end of August was in grain flat [t]ransferring and cleaning the flat. The corn was 6 years old and was the worst he has seen–lots of mold, bird droppings. Tons of pigeons and sparrows in the flat 'all the time'."

¶ 16    The claimant testified that he notified Heil of his histoplasmosis diagnosis the same day of the biopsy by a text message. Heil, however, testified that he did not hear anything from the claimant after their last meeting in September except for a text message sometime in November in which the claimant asked if there was any way he could earn $400 or $450 that day. According to Heil, the text did not state anything about the claimant's biopsy. Heil testified that he first learned that the claimant was claiming that his lung condition was caused by a work injury when the employer received a letter in the mail from the claimant's attorney in November stating that the claimant contracted histoplasmosis as a result of cleaning out grain elevators for the employer. Heil received a second text message from the claimant around that same time in November warning him to be careful about the "dust in the grain building or something to that affect [*sic*]."

¶ 17    Dr. Norris wrote a "Dear Employer" letter on November 11, 2010, in which he wrote as follows:

> "[The claimant] is being treated for a lung infection that he likely got being around grain dust/dust in general as well as pigeon feces and or mold. I recommended [the claimant] not work around these environmental exposures until his infection is adequately treated. Length of treatment is likely months and could be up to a year."

¶ 18    The claimant treated with Dr. Humam W. Farah on November 9, 2010. Dr. Farah wrote in his November 9, 2010, report that the claimant had been diagnosed with histoplasmosis and that he "was working around the bird feces and started to have chest pain and shortness of breath." Dr. Farah also noted that the claimant had smoked about one pack of cigarettes per day since he was 15, but was trying to cut down on his smoking.

¶ 19    In a medical report dated January 19, 2011, Dr. Farah wrote: "There is a significant history of exposure on the patient's occupational history. The patient was cleaning the dust out of grain elevators and was exposed to bird residue and this is known to be a significant risk factor for histoplasmosis." He opined that the claimant "had exposure in the grain elevator to bird residue which was resulting in the exposure to histoplasmosis and development of chronic histoplasmosis lung disease." He also noted that he advised the claimant to quit smoking. He believed that Dr. Kashyap's treatment for hypersomnia was unrelated to the diagnosis of histoplasmosis.

¶ 20    On March 11, 2011, the employer's independent medical expert, Dr. Charles B. Bruyntjens, authored a report based on a review of the claimant's medical records. In his report, Dr. Bruyntjens answered three questions posed by the employer, but the questions are not set out in the report or otherwise located anywhere in the record. Dr. Bruyntjens first wrote that "[i]n his working environment [the claimant] developed a cough with shortness of breath." He stated that the claimant's biopsy was consistent with histoplasmosis, but that the claimant's current condition was "unremarkable," that he has "a near normal pulmonary function test, nodules on his CT scan with minimal symptoms." Dr. Bruyntjens believed that "the overwhelming majority of patients with histoplasmosis are either asymptomatic or have rapidly resolving, self limiting disease requiring no treatment or follow-up." The doctor opined that if the claimant had been a nonsmoker, "a biopsy would probably never been done at the beginning of his work up and at his age could [have] been followed." He believed that the claimant's histoplasmosis "may have never been diagnosed, without any long term problems."

¶ 21    Dr. Bruyntjens then wrote as follows in answer to the employer's question "number two":

> "[I]t is probably true that [the claimant's] current condition is usually connected with his employment. The organism is a soil-dwelling fungus that river banks are favorite roosting sites. When such sites are disturbed by construction activities, vast amounts of potentially infectious aerosols may be formed. In a typical patient the illness resembles influenza."

¶ 22    He added that the onset is abrupt, consisting of fever, chills, and substernal chest discomfort, and that "normal hosts with primary pulmonary histoplasmosis recover eventfully more than 99% of the time." He opined: "It is virtually impossible to induce a second (reinfection) illness experimentally in previous histoplasma-infected animals. Yet many investigators dealing with histoplasmosis remain firmly convinced that reinfections histoplasmosis is a real entity, based on circumstantial evidence."

¶ 23 In answer to question "number three," he wrote that "it takes minimal exposure to acquire histoplasmosis which is recognized as an extremely common and almost invariably benign infection." Dr. Bruyntjens wrote that "a large majority of pulmonary or infectious disease specialists would have elected not even to treat the patient." He wrote, "The history of smoking with a near normal pulmonary function test with exposure in a benign condition like histoplasmosis, is a concern due to the smoking not the histoplasmosis."

¶ 24 On January 28, 2011, Dr. Norris wrote another "Dear Employer" letter stating that the claimant was unable to work "due to fungal lung infection that causes extreme fatigue, shortness of breath and pain." Dr. Norris wrote that the claimant's recovery would take a long time and was unpredictable and that he would be reevaluated in 60 days.

¶ 25 The claimant testified that, at the time of the arbitration hearing, the histoplasmosis was still affecting his lung functioning. He testified that he could not walk for long periods of time, had weakness in his arms and legs, could not sit or stand for very long, and had headaches, had back pains, and coughed a lot. He stated that he had quit smoking and had started using electronic cigarettes, but that he did "slip from time to time."

¶ 26 At the conclusion of the arbitration hearing, the arbitrator made a number of findings against the claimant. First, the arbitrator noted that the claimant listed October 4, 2010, as the date of accident on the application for adjustment of claim, but the claimant was not working for the employer on that date. The arbitrator found that the claimant resigned from his position on September 1, 2010, when he told Heil that he had cancer and was no longer willing to work for the employer because of scheduled medical appointments. The arbitrator found that during this conversation with Heil, he did not indicate that his medical condition had anything to do with his work for the employer and that the employer's first notice that the claimant "was claiming a work related medical condition was upon receipt of a letter from [the claimant]'s attorney on November 9, 2010." With respect to the issue of whether the claimant gave timely notice of his injury, the arbitrator found as follows:

> "[The claimant's] last day of actual work for [the employer] was August 31, 2010. [The employer] was required to be notified of a work injury at least by October 15, 2010; therefore, I find that notice to [the employer] was not received until November 9, 2010, beyond the 45-day requirement under section 6(c) of the Act."

¶ 27 The arbitrator also found against the claimant on the issue of causation. The arbitrator found "that while [the claimant] may have been exposed to histoplasmosis during his short period of seasonal work for [the employer], [the claimant] did not prove that his current condition of ill-being is causally related to a work injury." The arbitrator noted Dr. Bruyntjens' opinion that a large majority of pulmonary or infectious disease specialists would have elected not to even treat the claimant and emphasized his opinion that "[T]he history of smoking with a near normal pulmonary function test with exposure in a benign condition like histoplasmosis, is a concern due to the smoking not the histoplasmosis." The arbitrator also found it significant that Dr. Bruyntjens "noted the onset of histoplasmosis is abrupt, consisting of fever, chills, and substernal chest discomfort," but the claimant "did not report any fever or chills in his testimony."

¶ 28 With respect to prospective medical care, the arbitrator noted that Dr. Farah believed that the claimant needed to continue with Itraconazole treatment possibly for 6 to 12 months to address the chronic histoplasmosis lung disease. The arbitrator also noted that Dr. Norris estimated that the claimant's treatment would be between a few months and up to a year and

recommended that the claimant not work around dust, feces, or mold until his infection was cleared up. Nonetheless, the arbitrator found that the claimant failed to prove that future treatment was necessary as a result of the diagnosed histoplasmosis and that he did not "prove that any ongoing treatment was related to the histoplasmosis as opposed to a preexisting condition or cancer as [the claimant] reported to Mark Heil on September 1, 2010."

¶ 29    Again, the arbitrator found Dr. Bruyntjens' report to be persuasive on this issue as the arbitrator repeated Dr. Bruyntjens' opinion that most pulmonary or infectious disease specialists would have elected not even to treat the claimant and that the claimant's smoking was a concern, not the histoplasmosis. The arbitrator also noted that Dr. Bruyntjens did not recommend any treatment and indicated that "normal hosts with primary pulmonary histoplasmosis recover eventually 99% of the time." The arbitrator wrote, "[Dr. Bruyntjens] noted that the overwhelming majority of patients with histoplasmosis are either asymptomatic or have rapidly resolving, self-limiting disease requiring no treatment or follow up."

¶ 30    Finally, on the issue of TTD benefits, the arbitrator acknowledged that Dr. Norris opined in his January 28, 2011, letter that the claimant was unable to work due to a fungal infection that causes extreme fatigue, shortness of breath, and pain and that the claimant's recovery was unpredictable. The arbitrator found, however, that fatigue, shortness of breath, and chest pain were all symptoms that the claimant had in varying degrees before starting the 2010 season with the employer.

¶ 31    The arbitrator described the conflicting testimony on the issue of whether the claimant voluntarily left employment without inquiring about other positions that did not involve grain dust. The arbitrator found that Heil's testimony on this issue was corroborated by the voluntary-leave questionnaire that he filled out and by the text message he sent to the personnel department indicating that, based on his conversation with the claimant, the claimant's employment had ended on September 1, 2010. The arbitrator, therefore, found that the claimant "voluntarily resigned his seasonal position with [the employer] on September 1, 2010. By doing so, [the claimant] left [the employer] with no opportunity to offer a position away from the grain dust areas." The arbitrator concluded that the claimant was not entitled to TTD benefits.

¶ 32    The claimant appealed the arbitrator's decision to the Commission, and the Commission unanimously affirmed and adopted the arbitrator's decision. The Commission further found as follows:

> "The Commission finds that [the claimant] failed to prove exposure to bird feces or whatever causes histoplasmosis. Dr. Bruyntjens in his report noted that histoplasmosis is a fungus that grows in the soil and when its breeding sites are disturbed, the fungus becomes airborne and becomes common in the surrounding areas. [The claimant] did not provide any evidence that histoplasmosis grows in or on stored corn or was present in his work place. The Commission affirms all else."

¶ 33    The claimant appealed the Commission's decision to the circuit court, and the circuit court entered a judgment confirming the Commission's decision, finding that it "was not against the manifest weight of the evidence as to the issues of causal connection, date of accident, employer-employee relationship, course of employment, and notice." The claimant now appeals from the circuit court's judgment.

ANALYSIS

I

Accident

The disputed issues before the Commission included whether an accidental injury occurred that arose out of and in the course of the claimant's employment. Although the arbitrator found that the claimant may have been exposed to a fungus that causes histoplasmosis at the workplace, the Commission found that the claimant failed to prove that "histoplasmosis *** was present at his work place." On appeal, the claimant challenges this finding by the Commission.

In order to recover benefits under the Act, a claimant has the burden to show by a preponderance of the evidence that he suffered a disabling injury that arose out of and in the course of his employment. *Baggett v. Industrial Comm'n*, 201 Ill. 2d 187, 194, 775 N.E.2d 908, 912 (2002). "Whether a work-related accident occurred and whether it caused a worker's condition of ill-being are questions of fact for the Commission." *Pryor v. Industrial Comm'n*, 201 Ill. App. 3d 1, 5, 558 N.E.2d 788, 790 (1990).

The Commission's findings with respect to factual issues are reviewed under the manifest weight of the evidence standard. *Tower Automotive v. Illinois Workers' Compensation Comm'n*, 407 Ill. App. 3d 427, 434, 943 N.E.2d 153, 160 (2011). "For a finding of fact to be against the manifest weight of the evidence, an opposite conclusion must be clearly apparent from the record on appeal." *City of Springfield v. Illinois Workers' Compensation Comm'n*, 388 Ill. App. 3d 297, 315, 901 N.E.2d 1066, 1081 (2009).

"In resolving questions of fact, it is within the province of the Commission to assess the credibility of witnesses, resolve conflicts in the evidence, assign weight to be accorded the evidence, and draw reasonable inferences from the evidence." *Hosteny v. Illinois Workers' Compensation Comm'n*, 397 Ill. App. 3d 665, 674, 928 N.E.2d 474, 482 (2009).

In the present case, we believe that the Commission's finding that the claimant failed to prove a workplace accidental injury is against the manifest weight of the evidence. The Commission's findings that the claimant failed to prove (1) that exposure to bird feces causes histoplasmosis or (2) that histoplasmosis was present at his workplace are findings that are against the manifest weight of the evidence. The evidence presented at the arbitration hearing established the presence of airborne dust containing dried bird feces within the claimant's work environment and that dust containing bird feces is a cause of histoplasmosis.

The claimant testified that his job duties included cleaning out a large building called a grain flat as well as cleaning grain bins. Both the claimant's testimony and his medical records describe the presence of pigeons and bird droppings in the work areas and that the work activities generated a significant amount of airborne dust. The claimant went through three to five dust masks each day when he was performing work duties in the dusty work environments. The employer presented the testimony of its general manager, Heil, who was familiar with the claimant's work environments, and Heil did not contradict the claimant's testimony that bird droppings and pigeons were present in the flat and/or grain bins where the claimant performed cleaning duties. The obvious conclusion from this evidence is that the airborne dust that was present at the workplace contained dried bird feces.

The claimant's treating physician, Dr. Norris, authored a letter dated November 11, 2010, in which he stated that it was likely that the claimant contracted a lung infection from being

around grain dust as well as pigeon feces and/or mold. Another treating physician, Dr. Farah, noted in his records that the claimant was working around bird feces and started to have chest pain and shortness of breath. In a report dated January 19, 2011, Dr. Farah wrote that the claimant's occupational history showed "a significant history of exposure" including exposure to "bird residue" which "is known to be a significant risk factor for histoplasmosis." He specifically opined that the claimant's exposure to bird residue at the grain elevator resulted "in the exposure to histoplasmosis and development of chronic histoplasmosis lung disease."

¶ 44  In finding that the claimant failed to prove exposure to histoplasmosis at his workplace, the Commission purported to rely on the report of Dr. Bruyntjens. However, the Commission misquoted a crucial portion of Dr. Bruyntjens' report upon which it relied. The Commission mistakenly interpreted Dr. Bruyntjens' report to state that "histoplasmosis is a fungus that grows in the soil and when its *breeding* sites are disturbed, the fungus becomes airborne and becomes common in the surrounding areas." (Emphasis added.) We believe that this misstatement shows that the Commission misunderstood Dr. Bruyntjens' opinions to the extent that they can be determined from his report.

¶ 45  Dr. Bruyntjens' report is a statement of his opinions in response to three questions posed by the employer. Unfortunately, the record does not reveal what specific questions Dr. Bruyntjens' answered in his report, and this incompleteness of the record makes his report vague and imprecise. As part of his answer to question "number two," presumably some type of question that concerns causation, Dr. Bruyntjens wrote that "it is probably true that [the claimant's] current condition is usually connected with his employment." In addition, in another section of his report, he opined that "it takes minimal exposure to acquire histoplasmosis." These opinions do not contradict Drs. Norris and Farah's opinions that the claimant was exposed to histoplasmosis at the workplace but, instead, support their opinions.

¶ 46  In further answer to question "number two," Dr. Bruyntjens wrote the following incomplete and nonsensical sentence: "The organism is a soil-dwelling fungus that river banks are favorite roosting sites." Dr. Bruyntjens then concluded: "When such sites are disturbed by construction activities, vast amounts of potentially infectious aerosols may be formed." The Commission interpreted these two confusing sentences to mean that when the fungus' "*breeding* sites are disturbed, the fungus becomes airborne and becomes common in the surrounding areas." (Emphasis added.)

¶ 47  As the claimant notes in his brief, Dr. Bruyntjens used the term "roosting" in his report, not "breeding." The term "roosting" generally refers to winged animals settling or congregating in an area for rest or sleep. Merriam-Webster Dictionary, http://www. merriam-webster.com/dictionary/roost (last visited Mar. 18, 2014). Accordingly, Dr. Bruyntjens' reference to "roosting sites" tends to support the opinions of the claimant's treating physicians that the claimant contracted histoplasmosis as a result of exposure to bird feces at his workplace due to pigeons roosting in the grain flat and bins. This conclusion is confirmed by Dr. Bruyntjens' statement that it was probably true that the claimant's current condition is usually connected with his employment and his statement that "[i]n his working environment [the claimant] developed a cough with shortness of breath."

¶ 48  However, even under the Commission's interpretation of Dr. Bruyntjens' confusing report, an opinion that the fungus becomes airborne when the fungus' "breeding sites" are disturbed still does not contradict the opinions of Drs. Norris and Farah. Dr. Bruyntjens does not opine that the claimant's work environment would not qualify as a "breeding" site for the fungus. His

statement that river banks are favorite roosting/breeding sites is not the equivalent of opining that river banks are the *only* roosting/breeding sites for the fungus. In fact, in his report, he does not offer any opinion concerning whether the presence of bird feces at the claimant's workplace exposed him to the fungus. Instead, he opines that "[w]hen such sites (presumably roosting sites) are disturbed by construction activities vast amounts of potentially infectious aerosols may be formed." The claimant's undisputed testimony established that the grain flat and bins were "roosting sites" for pigeons and that his cleaning duties disturbed bird feces and created significant dust. Heil did not contradict this testimony. Accordingly, consistent with Dr. Bruyntjens' opinion, the claimant's work activities formed "vast amounts of potentially infectious aerosols." See also *Certi-Serve, Inc. v. Industrial Comm'n*, 101 Ill. 2d 236, 242, 461 N.E.2d 954, 957 (1984) ("Systemic histoplasmosis has been recognized in two opinions of the appellate court as having a causal connection with the inhalation of the dust from dried bird droppings.").

¶ 49    Based on the record before us, we find that the Commission's finding that the claimant failed to prove that he was exposed to a fungus at his workplace that caused histoplasmosis is against the manifest weight of the evidence. The claimant's testimony and the opinions of all of the experts, including the employer's, support the conclusion that the claimant was exposed to the fungus causing histoplasmosis as a result of infectious airborne dust created by the claimant's job duties.

¶ 50                                                    II
¶ 51                                                Causation
¶ 52    As noted above, the Commission affirmed the arbitrator based on its finding that the claimant failed to prove that he was exposed to histoplasmosis at his workplace. The arbitrator, however, found that while the claimant "may have been exposed to histoplasmosis during his short period of seasonal work for the [employer, the claimant] did not prove that his current condition of ill-being is causally related to a work injury." We cannot determine from the Commission's decision whether the Commission adopted this portion of the arbitrator's decision or whether its analysis with respect to the lack of a workplace exposure replaced this finding. After finding that the claimant failed to prove that he was exposed to histoplasmosis at the workplace, the Commission stated that it "affirms all else." To the extent that the Commission adopted this portion of the arbitrator's decision on the issue of causation, we reverse because this finding is also against the manifest weight of the evidence.

¶ 53    The existence of a causal connection between a workplace accident and the claimant's condition of ill-being is a question of fact for the Commission to resolve. *National Freight Industries v. Illinois Workers' Compensation Comm'n*, 2013 IL App (5th) 120043WC, ¶ 26, 993 N.E.2d 473. The Commission's findings with respect to factual issues are reviewed under the manifest weight of the evidence standard. *Tower Automotive*, 407 Ill. App. 3d at 434, 943 N.E.2d at 160. "For a finding of fact to be against the manifest weight of the evidence, an opposite conclusion must be clearly apparent from the record on appeal." *City of Springfield*, 388 Ill. App. 3d at 315, 901 N.E.2d at 1081.

¶ 54    To establish causation under the Act, a claimant must prove that some act or phase of his employment was a causative factor in his ensuing injury. *Land & Lakes Co. v. Industrial Comm'n*, 359 Ill. App. 3d 582, 592, 834 N.E.2d 583, 592 (2005). It is not necessary to prove that the employment was the sole causative factor or even that it was the principal causative

- 10 -

factor, but only that it was a causative factor. *Republic Steel Corp. v. Industrial Comm'n*, 26 Ill. 2d 32, 45, 185 N.E.2d 877, 884 (1962).

¶ 55     In the present case, the claimant testified that the symptoms he began experiencing while working in the dusty work environment included weakness, coughing, tightness and pain in his chest, and shortness of breath. The symptoms caused the claimant to seek emergency medical treatment on August 26, 2010. At the arbitration hearing held on March 21, 2011, he testified that he was still experiencing the ill-effects of the lung infection. His testimony was consistent with the opinion of his primary care physician, Dr. Norris, that the lung infection was causing the claimant extreme fatigue, shortness of breath, and pain. Dr. Norris believed that the claimant's recovery would take a long time and was unpredictable.

¶ 56     The arbitrator's finding that the claimant failed to prove that his current conditions of ill-being were causally connected to his workplace exposure to the fungus causing histoplasmosis was apparently based on the report of Dr. Bruyntjens. Dr. Bruyntjens, however, did not examine the claimant and did not expressly offer any opinion that the claimant's conditions of ill-being were unrelated to his workplace exposure to the fungus. Instead, on March 11, 2011, 10 days before the arbitration hearing, he opined that the claimant's "*current condition* is usually connected with his employment." (Emphasis added.)

¶ 57     Dr. Bruyntjens then opined, in general terms, that "normal hosts with primary pulmonary histoplasmosis recover eventfully more than 99% of the time." The doctor does not explain what recovering "eventfully" entails and did not set out the normal time frame for a patient with histoplasmosis to "recover eventfully."

¶ 58     More importantly, however, Dr. Bruyntjens does not opine, specifically, whether the claimant in the present case had recovered from his histoplasmosis and offered no specific opinion on a possible alternative cause to his conditions of ill-being. The claimant's treating physicians, however, opined that he had not recovered and attributed his conditions to the infection. It is not clear from the record that Dr. Bruyntjens could even give an opinion with respect to the claimant's current conditions of ill-being based on reasonable medical certainty by reviewing the claimant's medical records. His report does not detail which medical records he reviewed.

¶ 59     In his report, Dr. Bruyntjens describes how "reinfection" is difficult to induce experimentally in animals without explaining how this opinion may be relevant to the claimant's current condition. The doctor's failure to recite the specific questions he answered in his report contributes to the vague and confusing nature of the opinions in his report.

¶ 60     In answering the undisclosed question "number three," the doctor acknowledges that it takes minimal exposure to contract histoplasmosis, but that it is an "extremely common and almost invariably benign infection." He opines that "a large majority of pulmonary or infectious disease specialists would have elected not even to treat the [claimant]" and that the claimant's "history of smoking with a near normal pulmonary function test with exposure in a benign condition like histoplasmosis, is a concern due to the smoking not the histoplasmosis."

¶ 61     Dr. Bruyntjens' opinion that histoplasmosis is recognized as an "almost" benign infection is not the equivalent of an opinion, to a reasonable degree of medical certainty, that the claimant's infection is benign or even "almost" benign. In addition, the doctor's "concern" about the claimant's smoking is not the equivalent to an opinion that, to a reasonable degree of medical certainty, the claimant's current conditions of ill-being are unrelated to the workplace

exposure to the fungus causing histoplasmosis; Dr. Farah also noted a concern about the claimant's smoking.

¶ 62 As noted above, the claimant does not have the burden to prove that the employment was the sole causative factor or even that it was the principal causative factor, but only that it was a causative factor. Dr. Bruyntjens offered no opinion whether or not the claimant's histoplasmosis could be *a* causative factor. Again, his failure to set forth the specific question he answered makes his opinions vague and unclear on the specific issues that were before the Commission. His report falls far short of establishing opinions made to a reasonable degree of medical certainty on the issue of causation.

¶ 63 Under the facts presented at the arbitration hearing, we believe that it is clear that the claimant's histoplasmosis was a causative factor to conditions of ill-being at the arbitration hearing. The claimant presented credible medical evidence that his workplace environment caused him to contract histoplasmosis and that his conditions of ill-being are caused by the lung infection. The employer did not offer any coherent medical opinions to the contrary. The Commission's conclusion that the claimant's current conditions of ill-being are unrelated to a workplace exposure to the fungus causing histoplasmosis is contrary to the manifest weight of the evidence.

¶ 64                                                             III

¶ 65                                                           Notice

¶ 66 Section 6(c) of the Act requires the claimant to give notice of the accident "to the employer as soon as practicable, but not later than 45 days after the accident." 820 ILCS 305/6(c) (West 2010). Section 6(c) further provides that "[n]o defect or inaccuracy of such notice shall be a bar to the maintenance of proceedings on arbitration or otherwise by the employee unless the employer proves that he is unduly prejudiced in such proceedings by such defect or inaccuracy." *Id.* The Commission found that the claimant's last day of work for the employer was August 31, 2010. Therefore, the arbitrator found, the claimant was required to give the employer notice of a work injury at least by October 15, 2010. It found that the claimant did not give notice until November 9, 2010, when the employer received a letter from the claimant's attorney beyond the 45-day requirement of section 6(c).

¶ 67 Whether the claimant gave timely notice required by section 6(c) of the Act is a finding to be made by the Commission which will not be disturbed on appeal unless it is against the manifest weight of the evidence. *Gano Electric Contracting v. Industrial Comm'n*, 260 Ill. App. 3d 92, 95, 631 N.E.2d 724, 727 (1994). The purpose of the notice requirement is "both to protect the employer against fraudulent claims by giving him an opportunity to investigate promptly and ascertain the facts of the alleged accident and to allow him to minimize his liability by affording the injured employee immediate medical treatment." *United States Steel Corp. v. Industrial Comm'n*, 32 Ill. 2d 68, 75, 203 N.E.2d 569, 573 (1964). The notice is jurisdictional, and the failure of the claimant to give notice will bar his claim. *Thrall Car Manufacturing Co. v. Industrial Comm'n*, 64 Ill. 2d 459, 465, 356 N.E.2d 516, 519 (1976). However, a claim is only barred if *no* notice whatsoever has been given. *Silica Sand Transport, Inc. v. Industrial Comm'n*, 197 Ill. App. 3d 640, 651, 554 N.E.2d 734, 742 (1990). "If some notice has been given, but the notice is defective or inaccurate, then the employer must show that he has been unduly prejudiced." *Id.*

¶ 68    In the present case, we believe that the Commission's finding that the claimant failed to give any notice is against the manifest weight of the evidence. The facts of this case do not present a situation in which the claimant failed to give *any* notice. Instead, the claimant gave notice as complete as he was capable of giving as to the cause of his conditions of ill-being on September 1, 2010, when he told Heil that he could no longer work. The employer, therefore, must show that it was unduly prejudiced as a result of any inaccuracy of the notice. Without such a showing, section 6(c) cannot serve as a basis for barring the claimant's claim.

¶ 69    The evidence established that the claimant was exposed to the fungus causing histoplasmosis sometime after he began working for the employer on July 28, 2010, but before his last day of work on August 26, 2010. The Commission found that the claimant had a conversation with his supervisor, Heil, on September 1, 2010. This conversation took place within 45 days of the claimant's exposure to the fungus.

¶ 70    Heil's testimony conflicted with the claimant's testimony concerning the substance of that conversation. The Commission considered the conflicting testimony and found that the claimant "confided that he had cancer, and he would no longer be working for [the employer] because of scheduled doctor appointments." The Commission also found that "[a]t no time during that conversation did [the claimant] relate to Mr. Heil that his medical condition had anything to do with his work for [the employer]."

¶ 71    Heil testified that, prior to his conversation with the claimant, he was aware that the claimant was having lung and chest issues because he had heard other people at the workplace talking about the claimant's problems. According to Heil, the claimant came to him and told him that he had cancer and had medical appointments for tests and biopsies. Heil later wrote in a report, "We asked that he get an okay from doctor after he told us the doctor told him he needed to tell his employer of his health status." When the claimant's physician saw that he had lung nodules, the doctor initially suspected that the claimant had lung cancer. It was not until the claimant underwent a biopsy on October 4, 2010, that he and his doctors learned for the first time that he was suffering from histoplasmosis.

¶ 72    Accordingly, on September 1, 2010, the claimant gave notice of his conditions of ill-being to Heil to the fullest extent of his ability at that time. The Act requires the employee "to place the employer in possession of the known facts within the statutory period, but that a defect or inaccuracy in the notice is not a bar unless the employer is unduly prejudiced thereby." *Fenix-Scisson Construction Co. v. Industrial Comm'n*, 27 Ill. 2d 354, 357, 189 N.E.2d 268, 269 (1963). The facts found by the Commission present a situation in which the injured employee gave notice of all of the known facts to the employer within the statutory period. Therefore, any defect in the information that the claimant communicated to Heil is not a bar to the claimant's claim unless the employer can show that it was prejudiced as a result of the inaccurate notice.

¶ 73    For example, in *Raymond v. Industrial Comm'n*, 354 Ill. 586, 188 N.E. 861 (1933), an employee worked in a print shop and regularly handled metal plates that contained lead. He began suffering from dizzy spells, abdominal pains, belching, and other symptoms that were associated with an acute gall bladder disturbance. The employee had to quit work as a result of the symptoms, and the employer was aware that the employee was sick, although the exact cause of the sickness was unknown. The employee underwent surgery for gallstones on a mistaken diagnosis, and during the operation, the doctors discovered that the employee was suffering from lead poisoning. *Id*. at 588, 188 N.E. at 862. At that time, the Illinois

- 13 -

occupational disease act required the employee to give notice within 30 days of his disablement, and the surgery took place more than 30 days after the commencement of the employee's disability. *Id*. The issue the court addressed was whether the employer had proper notice under the occupational disease act. The court held that the employer did have sufficient notice and must show prejudice from any defect or inaccuracy of the notice before the employee's claim could be barred.

¶ 74       In its analysis, the court stated that the occupational disease act provided, "in substance, that disability caused by an occupational disease arising out of and in the course of the employment shall be compensable in the same manner and subject to the same terms, conditions, etc., as accidental injuries." *Id*. at 589, 188 N.E. at 862. At that time, the occupational disease act required that " 'notice of the disablement shall be given to the employer, and claim for compensation shall be made, in the same manner and within the same periods of time, respectively, as are now or may hereafter be provided in the Workmen's Compensation Act concerning accidental injuries sustained by employees arising out of and in the course of their employment.' " *Id*. at 589-90, 188 N.E. at 862 (quoting Ill. Rev. Stat. 1933, ch. 48, ¶ 87(b)(3)). At that time, the Workmen's Compensation Act provided that notice of an accidental injury must be given no later than 30 days after the accident. *Id*. at 590, 188 N.E. at 862-63 (citing Ill. Rev. Stat. 1933, ch. 48, ¶ 161).

¶ 75       The *Raymond* court held that the employee gave sufficient notice because the employer had notice that the employee was disabled within a week after his disablement; the employer knew as much about the nature of the illness as the employee; neither one knew that the employee was suffering from an occupational disease; neither one of them could be blamed for a failure to know; the giving of any number of further notices of the facts, so far as known to the employee, would not have enlightened the employer at all; and it was not shown that any defect or inaccuracy of the employee's notice prejudiced the employer's rights in the proceeding in any way. *Id*., 188 N.E. at 863.

¶ 76       The court, noting that the Workmen's Compensation Act is remedial in nature and has always been liberally construed, stated: "It cannot have been the intention of the Legislature in this kind of an act to require the impossible. It was manifestly impossible for the employee in this case to tell the employer anything about the disablement which the employee himself did not know." *Id*. at 590-91, 188 N.E. at 863. The employer knew that the claimant was sick within one week after he was compelled to quit work, and while this notice may have been "defective in not stating the then unknown fact that [the employee] was suffering from lead poisoning, it [was] not shown that the employer was prejudiced in any way by this defect." *Id*. at 593, 188 N.E. at 863-64. The court, therefore, held that the notice was sufficient under the particular facts of that case. *Id*., 188 N.E. at 864.

¶ 77       In the present case, the facts found by the Commission include findings that the employer's general manager, Heil, was aware that the claimant was suffering from lung and chest conditions at the time he left employment and that the claimant was working in a dusty environment. The claimant informed the manager what he knew at the time, *i.e*., that his doctors suspected that he had cancer. As the court stated in *Raymond*, "[a]ll the facts were known equally by both parties, and it is difficult to perceive any just theory upon which the employee would be bound to draw the correct medical inferences from those facts and the employer be excused therefrom." *Raymond*, 354 Ill. at 594, 188 N.E. at 864.

¶ 78    While the claimant's notice that he had cancer may have been defective or inaccurate, the notice, nonetheless, was sufficient under the facts of this case without a showing from the employer that it was prejudiced in some way, which it has not shown. The claimant cannot be expected to inform the employer that he suffered from histoplasmosis before his doctors had diagnosed the condition. "The notice requirement cannot be unreasonably construed so as to compel the impossible–to require a claimant to give notice of what he does not know." *McLean Trucking Co. v. Industrial Comm'n*, 72 Ill. 2d 350, 355, 381 N.E.2d 245, 247 (1978) (citing *Raymond* in analyzing notice under the Workers' Compensation Act). The supreme court has "consistently upheld the adequacy of incomplete notices where the defect consisted of a failure to inform the employer of facts unknown at the time to the claimant." *Id.*

¶ 79    In *McLean Trucking Co.*, the employee was an over-the-road trucker, and he collapsed at home and died shortly after returning from work. The employee's son telephoned a supervisor and informed him that his father had passed away. The employee's widow subsequently filed a claim for benefits under the Act. The employer, however, maintained that it had not received notice of an accident within 45 days as required by section 6(c) of the Act. The supreme court held that the notice given by the son was "as specific as it could be under the circumstances" and that the employer had the burden of proving that it had been unduly prejudiced by the notice. *Id.*

¶ 80    In *Sohio Pipe Line Co. v. Industrial Comm'n*, 63 Ill. 2d 147, 151, 345 N.E.2d 468, 470 (1976), the employer was timely notified of the employee's disability and hospitalization but was not informed of any facts that would lead it to believe that the employee suffered an accidental injury for which compensation might be claimed. Nonetheless, the court held that the claimant was not barred from seeking benefits under the Act. See also *Andronaco v. Industrial Comm'n*, 50 Ill. 2d 251, 278 N.E.2d 802 (1972).

¶ 81    In the present case, the Commission's finding that the claimant did not give sufficient notice under section 6(c) is contrary to the manifest weight of the evidence. Within 45 days of his accident, *i.e.*, exposure to the fungus causing histoplasmosis, the employer was aware that the claimant was suffering from chest and lung issues, knew that the claimant was working in dusty conditions, and knew that his doctors did not want him working around dust. The employer knew of the claimant's conditions and knew the type of work environment to which he was exposed. Although the claimant and his doctors initially thought that he was suffering from cancer, this inaccuracy in his notice to the employer has not prejudiced the employer in this proceeding. Therefore, the manifest weight of the evidence does not support the Commission's finding of a lack of notice under section 6(c) of the Act.

¶ 82    In addition, although the present case does not involve a repetitive trauma injury, we believe that the holding in *Peoria County Belwood Nursing Home v. Industrial Comm'n*, 138 Ill. App. 3d 880, 487 N.E.2d 356 (1985), *aff'd*, 115 Ill. 2d 524, 505 N.E.2d 1026 (1987), is relevant to our analysis with respect to notice. In *Peoria County Belwood*, the court held that "an employee may be 'accidently injured' under the Act as a result of repetitive, work-related trauma even absent a final, identifiable episode of collapse." *Id.* at 885, 487 N.E.2d at 360. In such cases, notice of the accidental injury must be given within 45 days from the date when "both the fact of the injury and the causal relationship of the injury to the claimant's employment would have become plainly apparent to a reasonable person." *Peoria County Belwood*, 115 Ill. 2d at 531, 505 N.E.2d at 1029. Under a repetitive trauma theory, the claimant

- 15 -

still must meet the same standard of proof as other claimants alleging an accidental injury in that he must show that the injury is work related. *Id.* at 530, 505 N.E.2d at 1028.

¶ 83    In the present case, the claimant did not suffer an accidental injury as a result of repetitive trauma. However, the claimant suffered an accidental injury by inhaling fungus and/or bird feces and contracting histoplasmosis. Because of the nature of this condition, it is impossible to pinpoint the exact moment in time or the exact place within the work environment in which the claimant inhaled the dust particle that gave rise to his accidental injury. He inhaled potentially infectious dust over a period of time between July 28, 2010, and August 26, 2010. In addition, when the claimant began suffering from conditions of ill-being, the causal connection between the dust inhalation and the conditions of ill-being was not readily apparent. Under these facts, to require the claimant to prove the exact date on which he inhaled the dust that caused the histoplasmosis and to prove that he gave notice 45 days from that date would require the claimant to do the impossible.

¶ 84    The legislature has mandated a liberal construction of the notice requirement. *S&H Floor Covering, Inc. v. Illinois Workers' Compensation Comm'n*, 373 Ill. App. 3d 259, 265, 870 N.E.2d 821, 825 (2007). Accordingly, we believe that under the facts of this case, the date of the claimant's accident, for purposes of determining the start of the notice and limitations periods, should be the date on which both the fact of the injury and the causal relationship of the injury to the claimant's employment would have become plainly apparent to a reasonable person. This allows an employee suffering from an accidental injury of the type presented in this case to establish a date of accident from which notice and limitations periods begin to run and, at the same time, allows the employee to be compensated for an accidental injury when its causal connection to current conditions of ill-being are not readily apparent.

¶ 85    The application of the "manifestation date" standard under circumstances when causation is not readily apparent should be flexible, fact-specific, and guided by considerations of fairness. *Durand v. Industrial Comm'n*, 224 Ill. 2d 53, 69, 71, 862 N.E.2d 918, 927-28 (2006). To require an employee to give notice of an accidental injury before a reasonable person would have knowledge of the causal relationship between his conditions of ill-being and his employment is "unrealistic and unwarranted." *Oscar Mayer & Co. v. Industrial Comm'n*, 176 Ill. App. 3d 607, 610, 531 N.E.2d 174, 176 (1988) (discussing repetitive trauma).

In the present case, on October 4, 2010, the claimant learned for the first time that his conditions of ill-being were causally related to a workplace exposure to histoplasma when the claimant's lung biopsy revealed that he had the lung infection. As noted above, we believe that the claimant gave sufficient notice under section 6(c) when he spoke with Heil on September 1, 2010, prior to the lung biopsy. Regardless of the oral notice on September 1, 2010, the Commission found that the employer received written notice on November 9, 2010, when the claimant's lawyer sent a letter to the employer stating that the claimant contracted histoplasmosis as a result of his work conditions. The letter was sent within 45 days after the claimant learned that his conditions of ill-being were causally related to a workplace accident. The letter, therefore, also fulfilled the notice requirements under section 6(c) of the Act.

¶ 86                                                  IV
¶ 87            Employer/Employee Relationship at the Time of the Accidental Injury
¶ 88    The Commission's finding that the claimant was not an employee of the employer on October 4, 2010, is factually accurate, but is legally insignificant under the facts of this case.

- 16 -

The evidence established that the claimant's conditions of ill-being are causally connected to an accident that occurred when an employer-employee relationship existed, although the causal connection between the accident and the conditions of ill-being was not apparent until after the employment had ended. For the reasons noted above, the evidence established that the claimant suffered an accidental injury that arose out of and in the course of his employment. Failure to discover the causal connection until after the employment relationship had ended does not justify denying the claimant benefits under the Act under the facts of this case. See *White v. Illinois Workers' Compensation Comm'n*, 374 Ill. App. 3d 907, 912, 873 N.E.2d 388, 392 (2007) (a repetitive trauma "accident date" can occur after the claimant's last day of employment with the employer).

¶ 89                                                   V
¶ 90                      TTD, Medical, and Prospective Medical Benefits
¶ 91      Because we reverse the Commission's findings with respect to accident, causation, and notice, we must remand the claimant's claim to the Commission for a determination of an amount for TTD, medical, and prospective medical benefits.

¶ 92                                            CONCLUSION
¶ 93      For the foregoing reasons, we reverse the circuit court's judgment that confirmed the Commission's decision, reverse the Commission's decision denying the claimant's claim, and remand to the Commission for a determination of the claimant's request for TTD, medical, and prospective medical benefits.

¶ 94      Reversed; cause remanded to the Commission.